Thomas A. Shaffrey v. Commissioner.
Shaffrey v. Commissioner
Docket No. 895-66.
United States Tax Court
T.C. Memo 1968-250; 1968 Tax Ct. Memo LEXIS 50; 27 T.C.M. (CCH) 1319; T.C.M. (RIA) 68250; October 29, 1968. Filed Herbert L. Zuckerman and David Zuckerman, 60 Park Pl., Newark, N.J., for the petitioner. Gerald Backer, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined the following income tax deficiencies and additions to tax against the petitioner: Additions to Tax
Year
Deficiency
Sec. 294(d)(2)I.R.C.
Sec. 6653(b)I.R.C. 1954
1939
1954
$ 8,747.60
$526.85
$ 4,373.80
1955
11,595.47
5,797.74
1956
6,912.55
3,456.28
1957
6,019.08
3,009.54
1958
5,828.12
2,914.06
The issues presented for decision are: (1) Whether petitioner understated his taxable income for the years 1954 through 1958 and, if so, what were the correct amounts of his taxable *51 income; (2) whether a part of the underpayment in each of the years was due to fraud with intent to evade tax, so that the bar of the statute of limitations is lifted and additions to tax may be imposed; and, (3) whether petitioner is liable for an addition to tax for substantial underestimation of estimated tax for the year 1954. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference. Thomas A. Shaffrey (hereinafter referred to as "petitioner") was a legal resident of Irvington, New Jersey, on the date the petition herein was filed and during the years in controversy. Petitioner and his wife, Alice M. Shaffrey, filed joint Federal income tax returns with the district director of internal revenue at Newark, New Jersey, on the cash basis of accounting for the taxable years 1954-1958, inclusive. Petitioner was born on September 7, 1914, and attended grammar school and high school in Irvington, New Jersey, from 1920 to 1932. In 1932, he entered college and was graduated therefrom in 1936, whereupon he became employed as a railway postal clerk. In the middle of 1939, he left the Post *52 Office Department to enter medical school, working only during his vacations from school, and was graduated from medical school in March of 1943. He then interned in a hospital until January 1944 when he was commissioned as Lieutenant in the Army. Upon his discharge from the Army in May 1946, he became a resident in surgery in a New Jersey hospital. During his internship and residency he attended patients, but did not commence the active practice of medicine until May of 1947 when he opened his own office. 1. Petitioner's Medical Practice In the years 1954 through 1958, petitioner engaged in the practice of medicine at 802 Grove Street, Irvington, New Jersey. Petitioner's office was on the ground floor and the two upper floors were used for living quarters for petitioner's family and his parents. Petitioner married in 1948 and by 1954 he had three children. Another child was born in 1957. Petitioner's practice consisted of attending patients at his office, at their homes, and at hospitals. He performed surgical services, including obstetrics, and assisted other surgeons at operations. During the years in issue, petitioner attended approximately 25 to 40 patients a working *53 day. His fees for hospital visits, surgery, and house calls varied. Many of his maternity cases were handled on a lump-sum basis, with the fee ranging from $50 to $150. He usually received $3 per office visit in 1954, $4 per visit in 1955 through 1957, and $5 per visit in 1958, although some long-time patients continued to pay only $3 per office visit in later years. Some patients, such as clergymen, were treated gratis. 2. Petitioner's Business Records Petitioner's business records concerning his medical practice consisted of (1) daily ledger sheets, (2) appointment books, (3) file cards, (4) check registers, and (5) medical-surgical plan records. The daily ledger sheets, known as "Histacounts," were used to record office visits and mail receipts. As to office visits, the Histacount sheets noted whether the patient had paid his bill, or was to be billed. Petitioner would usually make the 1321 entries in the Histacount, although his nurse, Helen Patkus, made entries on occasion. The appointment books were, as a general rule, used to record office visits. They were also used to record house calls, but only when petitioner informed his nurse that the patient had not paid *54 for the call and was to be billed. The appointment books did not contain entries respecting hospital visits, surgery, or surgical assistance rendered by petitioner. The nurse usually made the entries in the appointment books. At the close of the day, the nurse would compare the appointment book with the Histacount to ascertain whether all office callers had been accounted for by the petitioner. In some instances, petitioner would advise her that a patient was an obstetrical patient who had already paid or was to be billed a lump sum at a later date, or that the patient had not paid and was to be billed for the office call, or that the patient was not charged for the services rendered. If a patient was to be billed, the nurse would prepare a file card. There was no control account for the file cards. Rather, when the patient paid in full the file card was removed from the "active" file and placed in another drawer. At the end of the month, the nurse would prepare and send statements only to those patients who had cards in the active file. Entries on the file cards were made by both the petitioner and the nurse in the years in issue. Petitioner could and did remove cards from the *55 active file without the nurse's knowledge, as in the case of file cards sent to a collection agency. The check register was used to record mail receipts, and contained notations as to payor and amount. It was maintained solely by the petitioner. Subsequent to the years in issue and in connection with the audit of his return, petitioner made notations respecting the bank and account (including the "deferred credit account" described infra) in which the checks were deposited and noted the amount of the total deposit and the amount of cash deposited. In some cases, checks were totaled with no comment as to whether they were deposited. Petitioner also noted checks which were nonincome items. The nurse made the original entries in books reflecting maternity, surgery, and surgical plan patients. However, subsequent entries in the books, indicating that the patient had paid, were made by petitioner. In some cases there is a notation of "pd" with no amount; in other cases there is a notation of "pd" with the date of payment and not the amount; and in some other cases there is a notation of "pd" with the amount and date of payment. The patients paid petitioner, not the nurse, and 60 to *56 70 percent of them paid in cash. Similarly, petitioner, not the nurse, handled checks and cash received through the mail and made bank deposits. Petitioner kept no records with respect to total cash receipts from his practice. Petitioner received the following surgical assistance fees from John F. Masterson and William J. Duffy in the years 1954-1958, which fees were not recorded in the Histacount: Year
Amount
1954
$ 60
1955
230
1956
440
1957
1,165
1958
1,480
3. Petitioner's Bank Accounts and Deposit Boxes In the years 1954-1958, inclusive, petitioner made deposits in various regular checking and savings accounts, and in an account, variously described as a "deferred credit account" or "customer's collection account," maintained by the First National State Bank in Newark, New Jersey. The "deferred credit account" was used by the bank principally for the handling of unidentified deposits. Petitioner, however, was allowed to use this account for securities purchases, even though he maintained a regular checking account with the bank which he could have used for that purpose. Petitioner was the only customer who used the deferred credit account in this *57 manner. Petitioner would deposit cash and patients' checks in the deferred credit account with a written order for the purchase of stock or other securities. There were no deposit slips for the account; no receipts or bank statements were given to petitioner; and no individual ledger sheets were maintained by the bank. Upon receipt of a deposit, the bank would place the securities order, and the accounting department would enter the deposit on the bank's books. When the stock was subsequently delivered by the broker, the bank would issue its own check payable to the broker. The following is a table of petitioner's deposits in his bank accounts and the deferred credit account for the years 1954-1958, inclusive: 1322 Deposits
1954
1955
1956
1957
1958
First Nat'1 St Bk
Def. Cr. Acct.
$28,467.33
$45,142.92
$21,420.40
$ 7,848.14
Reg. Ch. Acct.
19,611.58
22,251.62
21,381.46
19,644.90
31,781.29
Howard Sav. Inst.
1,000.00
500.00
500.00
950.00
11,699.12
Federal Trust Co.
Reg. Ch.
4,801.00
Irvington Trust Co.
Reg. Ch.
842.50
Fidelity Union
Trust Co.
Reg. Ch.
1,000.00
$49,078.91
$67,894.54
$44,301.86
$28,443.04
$49,123.91
*58 1323 Whereas petitioner's deposits in the deferred credit account consisted primarily of cash, the periodic deposits (approximately every three weeks) he made in his regular bank accounts consisted primarily of checks. In August 1954, petitioner and his wife acquired a safety deposit box in the First National State Bank. Both were authorized to enter the box, and petitioner and his wife, or both, made a number of visits to this safety deposit box in the years 1954-1958. Petitioner also had maintained an individual safety deposit box in a different branch of the bank, which he had utilized from 1947 to August 1954. Petitioner placed cash receipts in these safety deposit boxes and maintained no records with respect to amounts placed in or withdrawn therefrom. Petitioner did not have a safe or a strong box at his home or office. He usually kept cash in a desk in his home in amounts approximating $1,000. Petitioner and his wife separated in September 1957, and she removed all the cash, $15,000, from the joint safety deposit box on September 2, 1957. She also removed $1,500 from their home. Petitioner's wife did not return any portion of the $16,500 to petitioner, and none of *59 the $16,500 was deposited in petitioner's bank accounts during 1957 or 1958. 4. Preparation of Petitioner's Tax Returns Petitioner's income tax return for the year 1947 or 1948 was audited in 1949 or 1950 and petitioner and his father attended a conference with an internal revenue agent. The revenue agent advised petitioner and his father as to the mechanics of the bank deposits and cash expenditures method. Subsequent to that conference, petitioner prepared his returns using a version of the bank deposits and cash expenditures method. The first return filed upon such method was for the year 1949 and the last prepared upon this method was the return for 1955. Petitioner's father, who was employed as a supervisor in the Post Office Department, assisted petitioner in the preparation of some of his returns. The assistance rendered was clerical in nature. He would total bills and prove them, but did not assist the petitioner in arriving at gross receipts for any of petitioner's returns. Petitioner did not total the Histacount for 1954. The 1955 Histacount was totaled and reflected gross receipts of $31,891. Petitioner utilized a figure of $30,451 for gross receipts in his 1955 *60 return computed on the bank deposits and cash expenditurs method. Petitioner's returns for the years 1954 through 1958 contained the following amounts for income taxes due, gross receipts from his medical practice, gross rental income, dividends, capital gains, and adjusted gross income (to the nearest dollar): Year
Income
Gross
Gross Rents
Dividends
Capital
Adjusted
Tax Due
Receipts
Gains
Gross Income
1954
$2,633
$24,163
$300
$1,630
$ 83
$15,813
1955
4,743
30,451
300
2,615
3,658
22,717
1956
4,594
30,772
300
3,799
189
22,418
1957
7,300
36,752
300
5,740
195
30,286
1958
4,450
31,349
300
5,664
(1,000)
23,369
5. Investigations of Petitioner's Tax Returns Petitioner's returns for the years 1954 through 1958 were the subject of a joint investigation by a special agent and a revenue agent. The investigation of civil liabilities covered the years 1954 through 1958 and the criminal investigation covered the years 1955 through 1958. At the outset of the investigation, which commenced in January or February 1960, petitioner was requested to supply records for the years 1955 through 1958 and to appear for *61 a personal interview. He declined to do either. By reason of his refusal, the agents proceeded to determine petitioner's income from sources other than his books and records. Circulars were distributed to banks in the metropolitan area, and the agent obtained records such as ledger sheets, deposit slips for regular accounts, credit memoranda, and records relating to the deferred credit account. From this material, the special agent was able to ascertain petitioner's gross bank deposits. The following techniques were employed by the agent to exclude from gross bank deposits those items deposited which did not constitute taxable income: 1324 (a) Since no deposit slips were maintained in connection with the deferred credit account, the agent analyzed the bank records, namely, the credit slips and the Departmental Proof Sheets, to determine the breakdown between cash and checks. (b) To exclude transfers from banks or brokerage houses, the agent first determined the debits to both the deferred credit and regular accounts by the use of, respectively, the bank's microfilms of the petitioner's canceled checks and the entries made in the bank's general ledger. He contacted brokerage *62 houses to determine what items were distributed from those accounts. By comparing the withdrawals from the various bank accounts and the brokerage accounts with deposits in banks, he was able to determine deposits attributable to transfers. He also noted that there were no checks made to "cash" and this was significant in that it eliminated the possibility of the redeposit of cash after a withdrawal. (c) To exclude loans, circulars were distributed to all banks and credit agencies in the area. The agent ascertained that there were two loans, both made at the First National State Bank, and exclusions were allowed for such items. (d) To exclude gifts and inheritances, petitioner's father and wife were interviewed and they informed the agent that there were no gifts or inheritances. (e) To exclude non-taxable insurance proceeds and premium rebates, the agent examined the bank's microfilm to see if any checks were paid to insurance companies by the petitioner. He then contacted the insurance companies and insurance agents to ascertain if the petitioner had received any insurance proceeds or rebates on premiums. He ascertained that there were insurance proceeds and the petitioner *63 was receiving rebates on premiums and these items were excluded from income. (f) To eliminate deposits representing return of capital, such as proceeds from the sale of stock and redemption of bonds, the agent examined petitioner's accounts with brokerage houses, his returns, and bank records to determine sales of stock. A schedule of bonds purchased and redeemed by petitioner was obtained from the Bureau of Public Debt. Items constituting return of capital were excluded. The agents did not exclude any amounts in the years 1954 through 1958 as attributable to a "cash hoard" maintained prior to January 1, 1954. The special agent, investigating the years 1955 through 1958, determined petitioner's "net worth" at the close of each of the years from 1949 through 1954. He commenced with 1949 because that was the first year of visible assets. He calculated that petitioner's net worth had increased by $71,684 in the period between December 31, 1949, and December 31, 1954. To this amount, he added $11,501.70 in income tax payments during the period from 1946 through 1954 and arrived at an amount of $83,185.70 for total expenditures, exclusive of personal living expenses. This meant that *64 petitioner, who had reported income of $72,519.19 for the nine years from 1946 through 1954, had expended $10,661.51 (without any consideration for cash living expenses) over reported funds available. Accordingly, the special agent concluded petitioner had no "cash hoard" as of December 31, 1954. At the conclusion of the joint investigation and at a conference conducted by the special agent's supervisor, petitioner was advised of the civil income tax liabilities (as determined by the revenue agent) and of the method of computation, the bank deposits and cash expenditures method. At that meeting, another request was made for records and petitioner again refused to comply with such request. The revenue agent and the special agent then submitted their reports. Petitioner, throughout the joint investigation, offered the agents no leads whatsoever, but did cooperate to the extent of executing a Form 872 (Consent Fixing Period of Limitation upon Assessment of Income and Profits Tax) for the taxable year 1957. On March 28, 1962, petitioner was indicted by a Federal grand jury at Newark, New Jersey, for wilful evasion of income taxes for the taxable years 1955 through 1958. On October 29, 1963, the *65 petitioner pleaded nolo contendere to the charge of wilful evasion of income taxes for the taxable year 1955. On February 1, 1964, based on the plea of nolo contendere, the petitioner was fined $10,000 and placed on probation for five years for evading his income taxes for the taxable year 1955. The counts in the indictment relative to the taxable years 1956, 1957, and 1958 were dismissed. Subsequent to the disposition of the criminal case, the revenue agent, in 1325 February 1964, contacted petitioner's representatives in connection with closing the civil aspects of the case. They arranged a meeting, the purpose of which was to discuss the revenue agent's computations and to afford petitioner the opportunity to present evidence, if any, to refute the revenue agent's findings. Additional evidence was submitted to and considered by the revenue agent as follows: (a) The revenue agent allowed additional exclusions in 1954 of $1,550 for exchanges and a clerical error. (b) The revenue agent did not allow exclusions for 15 items totaling $577.24 on the grounds that there was no showing they were deposited. (c) The revenue agent did not allow exclusions for additional bond redemptions *66 of $548.64 on the grounds that the petitioner had been allowed those redemptions reflected in the Government's records. (d) Petitioner's representatives only casually mentioned an alleged "cash hoard" and no evidence was submitted with respect thereto. Petitioner's representatives made no contention that they had books and records which would provide a basis for the precise computation of income for the years in issue. They indicated that, with the exception of a possible "cash hoard," they were satisfied that they had received all exclusions claimed. The notice of deficiency was mailed to petitioner on December 9, 1965. The notice contained the following schedule setting forth the respondent's computations of additional income: 1326 1954
1955
1956
1957
1958
Bank Deposits
$49,078.91
$67,894.54
$44,301.86
$28,443.04
$49,123.91
Payments in Cash
7,934.22
22,949.32
7,000.00
Wife's dividends
605.03
2,610.90
reflected per return
but not in deposits
Total
$49,078.91
$75,828.76
$44,301.86
$51,997.39
$58,734.81
Less non-busi- ness
8,516.11
25,359.79
1,292.63
2,757.56
10,602.67
deposits
Gross income
$40,562.80
$50,468.97
$43,009.23
$49,239.83
$48,132.14
Less per Return:
Business ex- penses
9,646.06
11,858.72
11,756.99
11,803.91
11,942.52
Rental expenses
713.22
657.72
690.95
699.64
901.22
Total
$10,359.28
$12,516.44
$12,447.94
$12,503.55
$12,843.74
Net Profit
$30,203.52
$37,952.53
$30,561.29
$36,736.28
$35,288.40
Add:
Capital Gains
Reportable
$ 30.08
$ 1,834.50
94.45
$ (46.01)
[1,000.00)
Interest Income
4.38
36.56
53.28
68.64
68.65
Total
$30,237.98
$39,823.59
$30,709.02
$36,758.91
$34,357.05
Add Estimated
Cost of Living *
7,800.00
7,800.00
7,800.00
6,000.00
3,000.00
Corrected Ad- justed
$38,037.98
$47,623.59
38,509.02
$42,758.91
$37,357.05
Gross Income
Adjusted Gross Income
15,813.11
22,716.67
22,417.53
30,286.37
23,369.30
per Return
Additional
Income
$22,224.87
$24,906.92
$16,091.49
$12,472.54
$13,987.75
*67 In the years 1957 and 1958, petitioner's wife received dividend income in the respective amounts of $605.03 and $2,610.90, which amounts were not deposited in petitioner's accounts maintained at the First National State Bank, the Howard Savings Institution, the Irvington Trust Company, or the Federal Trust Company. These amounts were reported on petitioner's income tax return filed for those years. Petitioner used cash business receipts to pay household expenses during the years 1954-1958 in the following amounts: 1954
1955
1956
1957
1958
$4,400
$4,400
$4,400
$3,800
$2,000
Petitioner made the following expenditures of cash in the years 1955, 1957, and 1958: 1955
1957
1958
Purchase of Cash- ier's Checks
$4,850.23
$ 6,449.32
$7,000.00
Loan Repayment
1,364.56
Cash Withdrawn by Alice M.
16,500.00
Shaf- frey
Total
$6,214.79
$22,949.32
$7,000.00
6. "Cash Hoard" Petitioner's returns for years prior to 1951 were not available at the time the audit of the years 1954 through 1958 was commenced. The special agent computed petitioner's adjusted gross income *68 for the years 1946-1950 by reference to the amount of taxes paid by petitioner in those years (to the nearest dollar), as derived from Government records, as follows: Year
Taxes Paid
Adjusted
GrossIncome
1946
$ 3
$ 600
1947
1
575
1948
58
1,800
1949
362
4,450
1950
1,276
8,974
$1,700
$16,399 Petitioner's return for the year 1951 indicates that the petitioner claimed depreciation in the years 1947 through 1950 in the respective amounts (rounded to the nearest dollar) of $120, $187, $187, and $731, for a total of $1,225. Petitioner's income tax returns filed for the years 1951, 1952, and 1953 disclose the following information respecting taxes paid, adjusted gross income, and depreciation (to the nearest dollar):
Year
Taxes Paid
Adjusted Gross Depreciation
Income
1951
$2,090
$12,800
$ 792
1952
2,551
13,742
* 1,828
** & 258
1953
2,471
13,462
* 1,874
** & 268
$7,112
$40,004
$5,020
In January and February of 1947, petitioner redeemed United States Savings Bonds that he had acquired from *69 1942 to 1944. The redemption was made prior to the maturity date of the bonds. Petitioner received $2,805.74 upon the redemption. In that year, petitioner acquired $1,196.26 in furniture and equipment. Again in May 1952, petitioner redeemed United States Savings Bonds prior to their maturity date, which bonds had been acquired from 1944 to 1949. The petitioner received $2,195.75 upon the redemption. In 1952, he expended $5,000 in connection with the purchase of his residence and $1,108.90, $589.76, and $1,866.05, respectively, for office furniture, a carpet, and alterations to the office. Petitioner's stock and security purchases in 1952 consisted of the following: (a) On October 27, 1952, he acquired a United States Treasury Coupon Bond (2 percent interest) for $5,022.83. (b) On July 15, 1952, he acquired 10 shares of stock for $1,560. Petitioner purchased his residence-office at 802 Grove Street in 1952 at a cost of $22,000, $17,000 of which was supplied through a mortgage on the property. In connection with obtaining the mortgage, petitioner submitted a financial statement to the bank in which he showed a total net worth of $19,500 made up of bank accounts of $1,100, United *70 States Savings Bonds of $4,500, marketable securities of $14,000, and no liabilities. On September 24, 1954, petitioner borrowed $2,000 from the First National State Bank, which amount was to be and was repaid in January 1955. He was charged 5 percent interest with respect to that loan. On October 17, 1955, petitioner borrowed $5,000 from the First National State Bank which he repaid in installments, the final installment being made in 1959. The effective rate of interest charged on this loan 1329 varied, since it was an installment loan, from 4 1/2 to 5 1/2 percent. Petitioner's savings prior to May 1947 were given to his father, who used some of the savings to pay a mortgage. Petitioner received the balance of his pre-May 1947 savings, if any, in March of 1963 upon the death of his father, as his father's principal beneficiary. Petitioner did not have a "cash hoard" as of January 1, 1954, and none of the bank deposits in the years in issue was made from a "cash hoard." Ultimate Findings of Fact Petitioner, with the intent to evade and defeat tax, understated taxable income and income taxes due thereon in his income tax returns filed for each of the years 1954 through *71 1958, inclusive. Opinion Respondent has determined deficiencies in petitioner's Federal income taxes for 1954-1958, inclusive, by the use of the bank deposits-cash expenditures method, and has determined additions to tax for fraud under section 6653(b), Internal Revenue Code of 1954, [1] for these years, and for a substantial underestimation of tax for 1954 under section 294(d)(2), [2] Internal Revenue Code of 1939. The years 1954 through 1956 are barred by the statute of limitations unless fraud is proved. [3] The years 1957 and 1958 are barred unless fraud is proved or the sixyear statute of limitations is applicable. [4]
*72 Petitioner was engaged in the practice of medicine in all of the years in issue, and has been actively practicing medicine since 1947. Respondent contends that petitioner intentionally failed to report his total income from the practice of medicine with the specific purpose of evading taxes. At the trial respondent presented evidence of petitioner's income as determined through the use of the bank deposits-cash expenditures method, corroborated by the "net worth" method. Petitioner did not attempt a reconstruction of his income under either of these methods but sought only to establish errors or inadequacies in respondent's proof of fraud or a 25 percent omission from gross income for 1957 and 1958. Petitioner contends that his returns, based on his books and records, were substantially accurate. 1. Use of Indirect Methods to Determine Income Petitioner's first contention is that respondent was without authority to use either the bank deposits-cash expenditures or net worth methods since, petitioner argues, his books and records of his medical practice adequately reflected his income. Both parties agree that any major unreported income would have to be derived from petitioner's *73 practice of medicine. Petitioner's financial records of his medical practice consisted of: (1) A "Histacount" sheet for each day, purportedly reflecting all receipts from petitioner's office practice and non-cash house calls; (2) check registers listing checks received by the petitioner, the payor, and the amount; (3) appointment books listing patients attended at the office or at home who had not paid petitioner and were to be billed; (4) loose-leaf books containing the names of obstetrical patients and patients covered by medical-surgical plans, with notations of payments; and (5) individual file cards for patients to be billed. Petitioner's tax returns for 1954-1958 were audited in 1960. At that time petitioner refused to supply his books. Since a criminal investigation was in progress, this refusal was quite clearly his privilege. However, 1330 respondent had an equal privilege to resort to less direct means of ascertaining petitioner's income. Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. As a result of respondent's investigation, it was found that large amounts of income were not reported on petitioner's *74 returns. At that point in time it was not possible to ascertain whether this was the result of erroneous books, or simply a failure to use the books to compute income. Petitioner cannot seriously contend that respondent should have proceeded no further because the books might be accurate. Cf. Morris Lipsitz, 21 T.C. 917, 931 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955). And, even if, when finally presented to the respondent, petitioner's books appeared to verify the amounts reported on the tax returns, respondent was not required to accept them as accurate. The tax must be applied to petitioner's true income, not necessarily the income reflected by his records. We conclude that respondent was fully justified in determining petitioner's taxable income by indirect methods. Lowell F. Bushnell, 49 T.C. 296 (1967), does not support petitioner. It does not stand for the proposition that respondent may not determine petitioner's income by an indirect method under the facts stated above. See Estate of George L. Cury, 23 T.C. 305, 333-334 (1954); H. A. Hurley, 22 T.C. 1256, 1261 (1954), *75 affd. 233 F. 2d 177 (C.A. 6, 1956). 2. Accuracy of Respondent's Calculations Nor do we agree with petitioner that respondent's calculations were erroneous for any of the years in issue. Petitioner challenges respondent's calculations in four respects: (a) Insufficient examination of his tax liability for 1954; (b) overstatement of petitioner's "cost of living" for the years 1954 through 1958; (c) improper treatment of the $16,500 taken by petitioner's wife in 1957; and (d) disregard of petitioner's alleged "cash hoard." (a) The Year 1954. Petitioner contends that respondent's agents did not make a thorough examination of petitioner's 1954 tax liability. Aside from the claim of a cash hoard, which we shall discuss infra, petitioner does not state precisely how respondent's activities were inadequate, but appears to rely on the fact that the year 1954 was not covered by the criminal investigation. Yet petitioner stipulated the amount of the 1954 bank deposits, and respondent submitted proof of all other items. While we have found as a fact that petitioner's living expenses were somewhat less than respondent originally estimated, we are satisfied that respondent *76 used all reasonable effort to arrive at the closest approximation possible. Indeed, petitioner's accountant testified that he was satisfied that respondent had eliminated all non-income deposits. (b) Cost of Living. In his notice of deficiency, respondent determined that petitioner had living expenses of $7,800 in each of the years 1954-1956, inclusive; $6,000 in 1957; and $3,000 in 1958. These estimates were based on information filed with the New Jersey Chancery Court in connection with petitioner's marital difficulties. Petitioner contends that his living expenses were never more than $2,400 per year. Petitioner's wife testified that he gave her at least $2,400 per year for household expenses for the years 1954 through 1957, and petitioner's own evidence indicates that his household and personal living expenses were at least $4,300 in 1950 and 1951. [5] It offends credibility to contend that petitioner's costs dropped in the years 1954-1957, after the birth of two children. We have accepted respondent's estimate of household and personal living expenses, as revised on brief, of $4,400 in 1954 through 1956; $3,800 in 1957; and $2,000 in 1958. The later years reflect lower living *77 expenses than the earlier ones because petitioner's wife and children no longer lived with him. (c) Wife's Cash on Hand. On September 2, 1957, Alice M. Shaffrey, petitioner's wife, removed $15,000 from petitioner's safety deposit box and $1,500 from his home. She retained these funds until March or May of 1958, when she deposited them in her own account. Respondent has included the full $16,500 in petitioner's taxable income for 1957, when those funds came to light, but not in his taxable income for 1958. In the 1331 corroborative net worth computation, respondent treated the $16,500 as an "expenditure" in 1957 but did not treat it as an asset acquired in 1958 when Alice Shaffrey deposited it. We believe the evidence supports respondent's position. Petitioner *78 contends that respondent's treatment of the cash has been inconsistent and has resulted in double taxation. We have studied the record, and have concluded that, regardless of nomenclature, the net effect of respondent's calculations has been consistent in its treatment of the $16,500 as income in 1957. Respondent's treatment of the $16,500 item results in no distortion of petitioner's income. Petitioner's bank deposits for the years 1954 through 1958 were, respectively, (to the nearest thousand): $49,000, $68,000, $44,000, $28,000, and $49,000. Eliminating non-business deposits leaves, respectively (to the nearest thousand): $41,000, $42,000, $43,000, $26,000, and $40,000. Petitioner's gross receipts from his practice of medicine, as reported in his returns for the years 1954 through 1958 were, respectively (to the nearest thousand): $24,000, $30,000, $31,000, $37,000, and $31,000. Thus, although petitioner's reported gross receipts from his medical practice for 1957 were $6,000 greater than for 1956, and $6,000 greater than for 1958, his bank deposits after eliminating non-business items for 1957 were $17,000 less than in 1956 and $14,000 less than in 1958. Petitioner testified *79 that he used his safety deposit box for current receipts prior to their being used to purchase securities through the deferred credit account. Thus, it seems clear that the $16,500 was correctly treated as 1957 income. (d) Cash Hoard. Petitioner seeks to discredit respondent's determinations of taxable income by relying on a "cash hoard" alleged in the verified petition to have been $87,000 as of January 1, 1954. He could have amassed this sum only by saving every penny earned since his first job as a railway postal clerk in 1936. This, in itself, is difficult to believe. But, even assuming this were true, it would not account for petitioner's bank deposits in excess of his reported business receipts in the years 1954 through 1958, since he testified that he turned over a substantial part of his savings to his father in, or before 1947, and did not regain them until his father died in 1963) It is apparent from the testimony of petitioner and his accountant that the cash hoard idea was arrived at as an explanation of his bank deposits in excess of reported business income, rather than as an actual fact. [6] The story is inconsistent with the fact that petitioner redeemed bonds prior *80 to maturity in 1947 when he established his medical practice, and again in 1952; it is inconsistent with the fact that petitioner did not make any investments until 1950; it is inconsistent with the fact that petitioner borrowed money at interest at least three times prior to and during the years in issue; it is inconsistent with a financial statement given by petitioner in 1952 to obtain a loan to purchase his residence; and it is inconsistent with the fact that petitioner made capital acquisitions in 1952 which would have eaten into any capital accumulated from his medical practice. Finally, the story is inconsistent with the fact that petitioner's adjusted gross income, as determined either by reference to taxes paid or actual returns in prior years, was insufficient to provide cash for such a hoard. We note that petitioner's cash hoard has grown as this case has progressed. In a sworn protest to the Internal Revenue Service dated February 11, 1965, petitioner claimed a cash hoard of $35,000 to $40,000 as of December 31, 1953. This included pre-1947 accumulations. The $87,000 figure was first stated in his petition to this Court, and this allegation was made only after petitioner's *81 accountant informed petitioner that he would need a prior cash accumulation of this amount to explain the excess deposits. We conclude that respondent's calculations were reasonably accurate for all the years in issue, and that petitioner understated his income in the years 1954-1958, inclusive, as determined by respondent in his notice of deficiency, adjusted for our finding as to the cost of living expenses. 3. Fraud We turn now to the issue of fraud. Of course, mere unexplained bank deposits are not sufficient to establish fraud, Denny York, 24 T.C. 742 (1955), but where, as here, large amounts of income 1332 are consistently and repeatedly omitted from tax returns, and a patently weak *82 explanation is given therefor, a strong inference of fraud attaches. See, e.g., M. Rea Gano, 19 B.T.A. 518 (1930); Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938); Boschma v. Commissioner, 374 F. 2d 863 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court. Petitioner's whole method of operation evidences a calculated intent to hide income derived from his practice of medicine. Petitioner's failure to report his surgical assistance fees and cash house call receipts, or to include them in his Histacounts; his use of a safety deposit box for current receipts, with no records as to the amounts contained therein; his use of current receipts to purchase cashier's checks; and his attempt to explain away the unreported income by use of a spurious cash hoard story, are clear and convincing evidence of fraud. Petitioner was fully aware of the bank deposits-cash expenditures method of computing taxable income. Indeed, he had used a version of the method in preparing his returns for the years 1949 through 1955. His continuous use of the deferred credit bank account in the years 1954 through 1957 for *83 deposits of cash and some checks received from his medical practice, was, we conclude, part of a studied effort to limit his easily traceable deposits and thereby to hide large quantities of his income. He gave no truly credible explanation of the use of such an "anonymous" account for cash deposits while concurrently using his regular account for deposits of checks. Furthermore, he was the only customer of the bank who regularly used the account in this way. The burden of proving fraud by clear and convincing evidence rested with respondent and we are satisfied that he carried that burden. We hold that for each of the years 1954 through 1958 petitioner filed "a false or fraudulent return with the intent to evade tax" and, therefore, the bar of the statute of limitations on assessment of deficiencies is lifted by section 6501(c)(1). We hold, further, that at least part of the underpayment of tax for each such year was "due to fraud" and, therefore, the additions to tax prescribed by section 6653(b) were properly determined. Once fraud was established the burden rested with petitioner to show any error in the amounts of the deficiencies determined by respondent. W.A. Shaw, 27 T.C. 561, 570 (1956), *84 affd. 252 F. 2d 681 (C.A. 6, 1958); Leonard B. Willits, 36 B.T.A. 294, 300 (1937); cf. Joseph A. Indelicato, 42 T.C. 686 (1964). No such errors have been shown except to the extent reflected in our findings as to living expenses. Petitioner introduced no evidence to rebut the imposition of the estimated tax penalty determined under section 294(d)(2) of the Internal Revenue Code of 1939. It follows that respondent's determination must be sustained. Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). Decision will be entered under Rule 50. Footnotes
*. Estimated - Information from court proceedings.↩
*. Depreciation on assets used in his practice. ↩
**. Depreciation on rental property.↩
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * * (d) Estimated tax - * * * (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax * * * in the case of individuals * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * * ↩
3. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (e) Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income Taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
5. Petitioner's Exhibit 44 was introduced by him to indicate that his father helped prepare his returns at least through 1951. Exhibit 44 is a computation based on the bank depositscash expenditures method, and it indicates personal living expenses paid in cash to be approximately $1,500 in 1949, $4,300 in 1950, and $4,400 in 1951. Petitioner testified that he gave his wife an additional $2,400 by check in 1949.↩
6. THE COURT: Did he tell you that he had 70 to 80 thousand or $87,000 in currency on hand? THE WITNESS [petitioner's accountant]: No, sir, he did not, but he did tell me after discussing the situation in the preparation of the petition, I pointed out to him that the government contended that there was some $80,000 or whatever the figure was which had to be on hand the first of the - the beginning of the period, to justify the acquisition of the subsequent assets.↩