Empire Mortgage & Investment Co. v. Commissioner.
Empire Mortg. & Inv. Co. v. Commissioner
Docket No. 697-69.
United States Tax Court
T.C. Memo 1971-270; 1971 Tax Ct. Memo LEXIS 62; 30 T.C.M. (CCH) 1161; T.C.M. (RIA) 71270; October 26, 1971, Filed. Edward R. Kane and Earle B. May, Jr., 4th Floor, Haas-Howell Bldg., Atlanta, Ga., for the petitioner. James D. Burroughs, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in the income tax of petitioner for its taxable year ended October 31, 1960, has been determined by the Commissioner in the amount of $20,982.87. The only issue to be decided is whether petitioner received for its covenant not to compete executed in that year the sum of $66,087.62, as determined by respondent, or the sum of $1 as reported by petitioner in its income tax return for that year. Findings of Fact Such facts as have been stipulated are found accordingly. Empire Mortgage & Investment Co., hereinafter referred to as the petitioner, was incorporated pursuant to *63 the laws of the State of Georgia under the name of Commercial Securities Corporation on October 1, 1954. The charter was amended on February 23, 1962, to change the name of the corporation to Empire Mortgage & Investment Co. At the time the petition was filed in this case, petitioner maintained its principal 1162 office at Tucker, Georgia. Petitioner keeps its books and records on an accrual method of accounting and files its tax returns on a fiscal year ending October 31. Petitioner filed its income tax return for the fiscal year ended October 31, 1960, with the district director of internal revenue, Atlanta, Georgia. On August 6, 1960, and prior thereto, petitioner owned all the outstanding common stock of the following subsidiary finance corporations: Liberal Credit Company, Inc., of Dalton Liberal Credit Company, Inc., of Americus Liberal Credit Company, d/b/a Colonial Credit Company Delco Finance Company, Inc., d/b/a Colonial Credit Company These subsidiary corporations operated as personal loan companies. Prior to August 1960, negotiations were conducted between J. Mack Robinson, acting for Dixie Finance Company, Inc., hereinafter referred to as Dixie, and *64 Conrad Sechler, president and 90-percent owner of the stock of petitioner, looking toward the acquisition by Dixie of the capital stock of the four loan companies owned by petitioner. These negotiations culminated in a sales agreement dated and executed on August 6, 1960, by and between Dixie and petitioner. Paragraph 2 of the sales agreement of August 6, 1960, provided that the purchase price for the stock was to be $152,952.40. This amount was to be paid in cash upon the consummation of the sale. The agreement further provided that $159,545.01 was to be paid for a covenant not to compete and goodwill which was to be paid by $39,545.01 in cash upon the consummation of the sale and $120,000 in bonds of Dixie. Paragraph 6 of the sales agreement of August 6, 1960, stated that a balance sheet was submitted by petitioner to Dixie for each of the subsidiary corporations as of July 31, 1960, and such balance sheets were submitted accordingly. Petitioner warranted and guaranteed that the balance sheets correctly reflected the assets, liabilities, and net worth of each of the subsidiary corporations as of July 31, 1960, in accordance with generally accepted accounting principles. At *65 the time the sales agreement of August 6, 1960, was executed, the petitioner simultaneously executed and delivered to Dixie its covenant not to compete. Paragraph 3 of the covenant not to compete executed on August 6, 1960, provided that Dixie pay petitioner $51,419.17 for the covenant not to compete and $108,125.29 for a covenant not to compete and goodwill. [1]
Paragraph 4 of the covenant not to compete agreement executed on August 6, 1960, specified that the agreement was to apply for a period of 3 years and was made applicable to petitioner and its officers. Under its terms, *66 petitioner and its officers agreed not to induce the employees of the subsidiary corporations to leave their employment or to solicit any present or former customers. They also agreed to refrain from engaging in the business of purchasing installment sales contracts within the counties of Whitfield, Floyd, Fulton, and Sumter, Georgia. Approximately 2 weeks subsequent to August 6, 1960, Dixie determined that of the accounts receivable of the four subsidiary corporations set forth in the various balance sheets, about $33,000 thereof was worthless. Therefore, negotiations were begun in which Dixie contended that the total purchase price stated in the sales agreement should be reduced by a like amount. Petitioner, on the other hand, contended that inasmuch as the stated purchase price was lower than it had contemplated in the first place, it was willing to "live with" the agreement as written. Such negotiations continued until April 5, 1961, and were culminated by a written agreement between Dixie and petitioner which reduced the originally agreed-upon sales price by an amount in excess of $16,000 to $296,080.91. Petitioner agreed to the reduction in sales price only on 1163 condition *67 that in the latter agreement, Dixie agree to a "more realistic" allocation of a portion of the sales price to the covenant not to compete. The result was paragraph 2 of the April 5, 1961, agreement which provided that the parties thereto mutually agree "that the value placed on the covenants not to compete included in the agreements dated August 6, 1960, shall not exceed $1.00." Petitioner's cost basis for the stock of the four subsidiaries sold by it to Dixie was $264,550.16. In the return filed for the fiscal year ended October 31, 1960, petitioner indicated that it was being liquidated under section 337 of the Internal Revenue Code of 1954. Subsequent to filing its return, petitioner informed the district director of internal revenue, Atlanta, Georgia, that the decision to liquidate under section 337 of the 1954 Code had been rescinded. In lieu of filing an amended return reflecting the gain on the sale of the stock of the four companies, it was suggested to the director that a revenue agent make a regular investigation of the petitioner's 1960 return as filed and include in his report the gain realized on the 1960 sale of the four companies. This procedure *68 was followed and a revenue agent prepared a report increasing income by $31,530.75 identified as "net gains, sale of capital assets." The resulting deficiency of $7,882.69 was duly assessed on September 1, 1961, and has been paid. The $31,530.75 gain determined by the agent was determined as follows: Total sales price (as amended)
$296,080.91
Cost basis of stock 264,550.16
Net gain realized
31,530.75
The taxable year ended October 31, 1960, was subsequently reopened and a determination made by the Commissioner that $66,087.62 of the sales price received by petitioner on the sale of the stock of the four subsidiaries was for a covenant not to compete, which is taxable as ordinary income. Ultimate Findings The agreement between Dixie and petitioner which was executed on April 5, 1961, did not supersede the agreements of August 6, 1960, for Federal tax purposes. The sum of $51,419.17 of the sales price received by petitioner for the sale of the stock in its four subsidiaries was for a covenant not to compete which is taxable as ordinary income. Opinion With respect to the fact that the purchase price received by a taxpayer for his covenant not to compete *69 constitutes ordinary income, there is no dispute between the parties. Their disagreement arises in the answer to the question whether petitioner received $66,087.62 for its and its officers' joint covenant not to compete as contended by respondent or $1 as urged by petitioner. In an arm's length transaction, Dixie and petitioner on August 6, 1960, entered into a purchase and sale agreement whereby Dixie purchased all of the stock of four of petitioner's wholly-owned corporations which were each carrying on a finance business. Negotiations with respect to the purchase price of the stock and the amount to be paid for the covenant not to compete of petitioner and its officers preceded the agreement. Upon the basis of the accounts receivable of the four subsidiaries of petitioner, Dixie made its offer of $152,952.40 for the stock and $159,545.01 for the covenant not to compete and goodwill of petitioner. The offer was accepted by petitioner and the agreement of August 6, 1960, resulted. Simultaneously with the execution of that agreement, petitioner and its officers executed and delivered to Dixie a covenant not to compete among other covenants. The covenant, except for the agreement *70 of Dixie to pay the mentioned purchase price, is unilateral in nature. It contains a breakdown of the purchase price between the covenant and "this covenant not to compete and goodwill," $51,419.17 being designated as consideration for the covenant alone and $108,125.29 for goodwill and the covenant. Petitioner's fiscal year ended on October 31, 1960. The purchase prices agreed upon were based upon Dixie's examination of the accounts receivable of the subsidiaries and their individual balance sheets furnished by petitioner. Shortly subsequent to the execution of the August 6, 1960, agreement, Dixie reviewed the accounts receivable and determined that the balance sheets contained worthless in the approximate amount of $33,000. It thereupon began negotiations with petitioner for a reduction of the purchase price for the stock and goodwill in a like amount. These negotiations continued until April 5, 1961, when a document entitled "Amendment to Covenants and Agreements dated August 6, 1960," was executed by Dixie and petitioner, the effect of which was to reduce the formerly agreed-upon purchase price for the stock and goodwill by 1164 $16,416.50. The document also provided that the *71 value formerly agreed to with respect to the covenants not to compete "shall not exceed $1.00." It is on that premise that petitioner did not include any amount in its return for the year at issue representing the receipt of ordinary income from its covenant not to compete. We are satisfied that its premise for so doing is without substance and does not reflect the reality of its sales transaction with Dixie. As we view it, petitioner is here arguing that regardless of whether the real amount received by it for its covenant not to compete is that expressed in the document setting forth the terms of its covenant, nevertheless by its April 5, 1961, amendatory agreement, we are bound thereby to find a value therefor not to exceed $1. We are convinced that that portion of the latter agreement which relates to the value to be allocated to the covenant not to compete is ineffective for that purpose. It is an afterthought and a sham and bears no relationship to the realities or substance of the situation. The original amount allocated by the parties to the covenant ($51,419.17) was fixed by petitioner and Dixie in an arm's length transaction after extended negotiation. The record discloses *72 no identifiable event occurring in the ensuing 8 months which would have the effect of reducing this value to virtually zero, yet that is the purport of the amendatory agreement. We find the value to have remained unchanged. To hold to the contrary results in an absurdity. Dixie, who was the aggrieved party seeking a reduction of the overall purchase price, which reduction to the extent of in excess of $16,000 was acceded to by petitioner, actually would bear the burden of paying a like amount for worthless accounts receivable in addition to being deprived of the tax advantage incident to the actual amount it paid petitioner for the covenants. While the value placed on the covenants in the amendatory agreement might be said to be binding as between Dixie and petitioner, it is certainly not binding on respondent for the reason that petitioner actually received the originally agreed-upon amount therefor. Neither the stringent "Danielson" rule of fraud ( Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549 (1965)) nor the "Ullman" rule of strong proof ( Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957)) *73 has application in this instance. Those cases involved the degree of proof which a taxpayer must produce to arrive at a tax result contrary to an agreement entered into by the taxpayer. In this case, it is the Commissioner who argues that the substance of the transaction was other than the form finally given. In a case generally following the Ullman rule, but with facts distinguishable from those present here, the Court of Appeals for the Fifth Circuit in Balthrope v. Commissioner, 356 F. 2d 28, 31 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court, stated: Courts generally honor the parties' bargaining for tax consequences dependent upon the price of a vendor's covenant not to compete. Barran v. Commissioner of Internal Revenue, 5 Cir. 1964, 334 F. 2d 58. But there are limits. Courts need not honor a vendor's covenant which has no basis in economic reality. Schulz v. Commissioner of Internal Revenue, 9 Cir. 1961, 294 F. 2d 52, 53. * * * Neither the Schulz nor the Barran case indicates that the Commissioner is subject to the "strong proof" rule of Ullman, supra. In this case the evidence adduced clearly shows that *74 the parties to the sale actively bargained for the covenants, and that Dixie considered them crucial to the transaction. It is without economic reality to assign to them $1 of the total consideration of the transaction. Petitioner has failed to convince us that the portion of the total consideration for the combined sale and covenant agreement which is attributable to the covenant is less than the $51,419.17 initially allocated by the parties. In his notice of deficiency respondent has allocated the amount of $66,087.62 to the covenants not to compete. We can find no explanation in the files or records of this case of his computation of this amount and we are convinced that the evidence does not support it. We have affirmatively found therefore on the evidence before us that of the total purchase price received by petitioner for stock, goodwill, and covenants not to compete, petitioner received $51,419.17 for the covenants. Decision will be entered under Rule 50. 1165 Footnotes
1. The sales agreement of August 6, 1960, specifies the amount of $159,545.01 for a covenant not to compete and goodwill. The covenant not to compete agreement breaks down this total of $159,545.01 into two separate categories as follows: Item
Amount
Covenant not to compete
$ 51,419.17
Covenant not to compete and goodwill
108,125.29 The breakdown of these categories totals $159,544.46. There is a difference of 55 cents between the amount spelled out in the "Covenant Not to Compete" and the amount set forth in the sales agreement. This difference results from a mathematical error.↩