264 F.2d 305
 59-1 USTC P 9314
 David H. ULLMAN and Claire W. Ullman (husband and wife), Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
David H. ULLMAN, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Benjamin ULLMAN, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Benjamin ULLMAN and Anna Ullman (husband and wife), Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 103-106, Docket 25068-25071.
 United States Court of Appeals Second Circuit.
 Argued Nov. 5, 1958.
Decided March 4, 1959.
 
 Philip A. Brenner, New York City (Philip A. Brenner, Julius Kuschner, of counsel), for petitioners.
 Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Joseph Kovner, Attorneys, Dept. of Justice, Washington, D.C., for respondent.
 Before CLARK, Chief Judge, WATERMAN, Circuit Judge, and GALSTON, District Judge.
 WATERMAN, Circuit Judge.
 
 
 1
 Petitioners appeal from a decision of the Tax Court, 29 T.C. 129, upholding a determination by the Commissioner that $350,000 received by petitioners and another in connection with the sale of the capital stock of three linen supply corporations was received by them in consideration for their covenants not to compete with the purchasers, and hence was taxable as ordinary income. The facts are fully set forth in the Tax Court's opinion, and we state only those we deem necessary for the purpose of disposing of the questions presented to us.
 
 
 2
 Petitioners David Ullman and Benjamin Ullman together with their brother Richard (not a party to this appeal) had been engaged in the operation of a number of laundries and linen supply companies for some years when they began negotiations in August 1945 to sell to Consolidated Laundries Corporation the entire capital stock of three linen supply companies of which they, in varying proportions, were the sole stockholders.[1] About a year later, on August 8, 1946, written agreements of purchase and sale were entered into. The sale of the corporate stock in each of the three companies was the subject of a separate agreement and the sums that Consolidated paid in each case were paid to the Ullmans in direct proportion to their respective stock interests in each corporation. Each agreement provided that a sum of money, to be paid over at the time of closing, represented the sale price of the corporate stock. Each agreement also provided that an additional sum of money, one-fifth of which was to be paid at closing, two-fifths payable in 1947, and two-fifths payable in 1948, was being paid in consideration of agreements on the part of the Ullmans to execute and deliver to Consolidated covenants not to compete with Consolidated.[2] On the same day, August 8, 1946, each of the Ullmans executed a separate agreement labeled 'Restrictive Covenant' containing several carefully delineated commitments on each of their parts. These commitments included promises that for a period of seven years within competitive areas the Ullmans would not solicit present or former customers of the linen supply companies Consolidated was acquiring that day, and would not assist financially, engage in, or be interested in any similar business that could compete with the linen supply companies so being acquired, or with Consolidated itself; provided, however, that the Ullmans could continue their present stockholdings or connections in six other linen supply companies operating in competitive areas upon condition that these six companies did not solicit customers of the three companies Consolidated was acquiring. Also on the same day, August 8, 1946, the Ullmans executed a document labeled 'Guaranties' whereby they agreed, among other things, to pay Consolidated 'the sum of thirty dollars per dollar of the weekly average sales for any customer' of the three companies then being sold if such customer should thereafter cease to be such and thereafter received linen services from any one of the six companies in which the Ullmans were permitted to continue to have business interests.
 
 
 3
 There were other documents also executed on August 8, 1946, some by the three Ullmans and others by an individual Ullman. These are set forth in the Tax Court findings of fact and opinion, but their contents have no direct bearing on the questions before us, except the obvious one that all the documents and agreements executed on August 8, 1946 were part of the same over-all transaction.
 
 
 4
 Some time after the original negotiations began in August 1945 the parties arrived at a price formula of 'forty dollars per dollar of weekly collections from customers taking linen service, such collections being in excess of $2,500 per week.' Accountants and financial men acting for the parties were called upon to determine the weekly sales of each of the linen supply corporations, the manner in which the total sums Consolidated was to pay were to be allocated among the different companies sold, and the details of the payments to the stockholders. Their computation resulted in a round figure of approximately one million dollars to be paid to the stockholders of the Ullman corporations. Several weeks before the legal documents relating to the sale transaction were executed the question of assigning a certain amount of money for restrictive covenants came up for consideration. Originally Consolidated wanted $400,000 set aside for this purpose out of the agreed over-all price, but after this was discussed with the sellers this sum was reduced to $350,000. The gross sum the stockholders received under the three purchase agreements that was stated in the agreements to be for the corporate stock was $647,000, all to be paid in 1946. The gross sum the stockholders received that was stated in the three purchase agreements to be received for the covenants not to compete was $350,000, of which $70,000 was paid in 1946, and $140,000 was payable in each of the years 1947 and 1948.
 
 
 5
 The petitioners treated their shares of the entire $997,000 received from the transaction as the price received for the sale of their capital stock, allocating nothing whatever separately to their covenants not to compete. Consolidated contrariwise recorded $350,000 on its books as a separate expense item attributable to the covenants and amortized this cost over a seven-year period.
 
 
 6
 It is well established that an amount a purchaser pays to a seller for a covenant not to compete in connection with a sale of a business is ordinary income to the covenantor is ordinary income to the covenantor and an amortizable covenant is so closely related to a sale of good will that it fails to have any independent significance apart from merely assuring the effective transfer of that good will.[3] Petitioners do not contest the soundness of that rule. They insist to us that the Tax Court's determinations that the covenants were separate items apart from the transferred good will and that the $350,000 was given in specific payment therefor were clearly erroneous. They argue that the price of the covenants as stated in the contract was simply a fictitious allocation designed to benefit the tax position of the buyer, the true value of the covenants being inconsequential or at least being much less than the $350,000.
 
 
 7
 The burden of proof in the Tax Court is on the taxpayer,[4] and we agree with the Tenth Circuit in their decision in Hamlin's Trust v. C.I.R.[5] that when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money.
 
 
 8
 Here we find that petitioners did not sustain their burden of proof. First of all, they fail to support their contention that the covenants had no independent significance apart from a transfer of the good will of the businesses. Petitioners were not in any real sense connected with that good will since they had little, if any, contact with customers. Hence we fail to see how their covenants were necessary in order to transfer the good will of the corporations. Petitioners, however, would have been in a position to supply technical knowledge to and aid in the financing of a competitive business, and it is logical to believe that in anticipation of such a possibility and in order to forestall such activity the purchaser was willing to pay dearly for the covenants.
 
 
 9
 Petitioners' argument that they never negotiated as to a value for the covenants, thereby implying that the treatment of them was a unilateral action on the part of Consolidated, noticed only casually by themselves, is also without support. The $50,000 reduction in the total sums stated to have been paid for the covenants, a reduction beneficial taxwise to petitioners and detrimental to Consolidated, and the careful phrasing of the covenants so as to allow petitioners to continue their connection with certain other companies, indicate that some negotiation went on. Petitioners present no proof sufficient to substantiate their claim of unilateral action. Nor are we impressed with petitioners' varied attempts to demonstrate that the sums stated to have been paid for the covenants ought to have been disregarded by the Tax Court because patently unrealistic. For instance, appellants argue that the chances were extremely minute in 1946 that David, Benjamin and Richard would have the desire or the physical capacity to engage in business activities after the sale to Consolidated, and that consequently Consolidated would not have paid $350,000 for their covenants. But petitioners offered no convincing proof in support of this argument. The Tax Court found that ten years later, in December 1956, at the time of the trial, the appellants David and Benjamin were working in supervisory capacities for two corporations wholly owned by them, and that the third brother Richard though no longer active in business in 1956 was in good health in 1946 and could have worked at that time had he wished to do so. Petitioners also point out that the corporations Consolidated acquired had contracts with their customers for terms of two years and that these contracts were 'automatically renewable.' It did not appear how often these contracts were renewable or whether they were automatically renewable by the linen supply corporations, but in any event Consolidated could well have believed it worthwhile to spend $350,000 to prevent the Ullmans from interfering with the acquisition of new customers. And petitioners mention, too, that economic considerations made it highly improbable that the sellers could effectively compete against the buyer, but this suggestion is wholly without evidence to support it.
 
 
 10
 Finally, in an attempt to show that, even if the covenants and value, their value was much less than $350,000, petitioners direct attention to the terms of the guaranties they executed in which they agree to pay stipulated damages to Consolidated for diversion of customers. They reason that since the guaranties provided that $30 per dollar of a customer's average weekly sales represented 'the reasonable amount of damages that would be sustained by Consolidated by reason of the loss of any linen supply customer,' that amount is the value properly allocable to the good will that was sold. If this theory were adopted the remaining $10 per dollar of average weekly sales that the Ullmans received would have to cover the value of linens and fixtures and other transferred assets as well as the value of the covenants not to compete. On this basis, after deducting the value of the chattels, petitioners assign to the covenants a value of $112,311.66. The difficulty here is that there is no real hypothesis to start with, for there is no real showing tht $30.00 per dollar actually represented the value of the good will. The Tax Court could well have believed, since there was no evidence to the contrary, that the statement in the guaranties was just as fictitious a statement as petitioners contend to us the covenant allocation was. The Tax Court was not required to give conclusory weight to the phrase 'the reasonable amount of damages that would be sustained,' for it is a fair inference that the parties used that language in order to avoid the danger of having liquidated damages struck down as unenforceable penalties.[6]
 
 
 11
 The decisions of the Tax Court that there are deficiencies in the income taxes of the appellants for the calendar years 1946, 1947 and 1948 are affirmed.
 
 
 
 [1]
 Except for six per cent of the stock of Paramount, one of the companies, held by an employee
 
 
 [2]
 In these respects, as one notes from the Tax Court's findings, the language of the three agreements was identical. The Tax Court's summary of the contract for the sale of one of the companies, Champion, follows:
 'On August 8, 1946, the three Ullman brothers also entered into a similar 'Agreement' with Consolidated for the sale of all the stock of Champion for the sum of $105,000, which was to be paid at the time of closing to the sellers as follows:
 Name Amount
David Ullman ..... $ 66,150
Richard Ullman ..... 21,000
Benjamin Ullman .... 17,850
 --------
 Total ......... $105,000
 'The Champion agreement further provided that the sellers of the Champion stock would execute and deliver to Consolidated covenants not to compete in the linen supply business, and in consideration thereof Consolidated agreed to pay them the following sums on the dates indicated:
 On signing
 of February February
 this 15, 15,
 contract 1947 1948
David Ullman ......... $5,796 $11,592 $11,592
Richard Ullman ........ 1,840 3,680 3,680
Benjamin Ullman ....... 1,564 3,128 3,128"
 
 
 [3]
 Wilson Athletic Goods Mfg. Co. v. C.I.R., 7 Cir., 1955, 222 F.2d 355; Commissioner of Internal Revenue v. Gazette Tel. Co., 10 Cir., 1954, 209 F.2d 926; Hamlin's Trust v. C.I.R., 10 Cir., 1954, 209 F.2d 761; Toledo Blade Co. v. C.I.R., 6 Cir., 1950, 180 F.2d 357, certiorari denied, 1950, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596; Beal's Estate v. C.I.R., 2 Cir., 1936, 82 F.2d 268; Cox v. Helvering, 63 App.D.C. 264, 71 F.2d 987
 
 
 [4]
 9 Mertens, Law of Federal Income Taxation 50.61 (1958), and cases cited therein
 
 
 [5]
 10 Cir., 1954, 209 F.2d 761
 
 
 [6]
 See 3 Williston on Contracts 776-779 (1936)
 The document entitled 'Guaranties' executed by the three brothers contains in one paragraph the sentence relating to 'the reasonable amount of damages' and the statement that $30 per dollar 'does not constitute, nor is it intended to be, a penalty.' The paragraph reads:
 'The undersigned hereby acknowledges that the aforesaid sum of Thirty ($30.00) Dollars per dollar represents the reasonable amount of damages that would be sustained by Consolidated by reason of the loss of any linen supply customer. The undersigned further acknowledge that the same does not constitute, nor is it intended to be, a penalty.'