T.F.H. PUBLICATIONS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8621–75.    Filed July 5, 1979.

*Herbert M. Gannett* and *Harvey R. Poe,* for the petitioner. *Bernard S. Mark,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax as follows:

| *FYE Sept. 30.—* | *Deficiency* |
| --- | --- |
| 1971 | $165,304 |

Because of concessions by petitioner, the issues remaining for our decision are:

---

(1) Whether evidence is admissible to attempt to explain or vary the terms of a written contract of sale of business assets;

(2) Whether a credit for future advertising given by the buyer to the seller as part of the purchase price of a printing and publishing business is taxable income to the buyer; and

(3) If so, when the income was taxable to the buyer.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

T.F.H. Publications, Inc. (hereinafter referred to as T.F.H. or petitioner), was incorporated in New Jersey on January 14, 1971. Its principal place of business at the time it filed its petition herein was in Neptune, N.J. Petitioner timely filed its income tax returns for its taxable years ended September 30, 1971, and September 30, 1972, on the accrual basis of accounting.

Miracle Pet Products, Inc. (hereinafter referred to as Miracle), was organized in 1952 as T.F.H. Publications, Inc., by Herbert Axelrod (hereinafter referred to as Axelrod) and others. Two years later Axelrod became the sole shareholder. In 1968, the name of the corporation was changed to Miracle to reflect the expanded nature of the corporation.

In 1960, Miracle became publicly held. Axelrod became the controlling shareholder. As of March 16, 1971, Axelrod owned directly 230,967 shares of Miracle's 676,877 total outstanding shares. Evelyn Axelrod owned the beneficial interest in 12,835 shares as of April 20, 1970. From its inception until August 1964, the corporation's only business activity was the publishing, printing, binding, and distribution of books, pamphlets, and magazines concerning pets, plants, flowers, and hobbies. In 1964 and 1965, the corporation expanded through acquisitions into the businesses of breeding and selling tropical fish, the manufacture and production of aquariums and aquarium-related products, and the manufacture, sale, and distribution of a complete range of pet products. One of Miracle's wholly owned subsidiaries was Communications Processing, Inc. (hereinafter referred to as CPI).

From 1964 to 1969, the proportion of Miracle's total sales derived from its publishing and printing business decreased from 100 percent to 20 percent. The principal reason for this

decline was the entry into the pet publication field by Miracle's major customer, Hartz Mountain Corp.

In 1970, Miracle was indebted in substantial amounts to the First Jersey National Bank and to Talcott, a factor. Miracle's inability to satisfy these obligations led to a deteriorating relationship. Discussions commenced between the bank, Talcott, and Axelrod concerning the outstanding debt and the future business operations of Miracle. As a result of these discussions, Miracle's board of directors and the executive committee decided to sell the printing business. However, Miracle was unable to locate a purchaser whose terms were acceptable to it. At this juncture, Axelrod proposed to Miracle and its financiers that he make the acquisition. The bank offered to finance the acquisition for $500,000 on condition that $300,000 of the purchase price be paid by Miracle to the bank in reduction of its debt. This proposal was acceptable to Miracle. However, Miracle and Axelrod were deeply concerned that the terms of the acquisition be beyond reproach because of Axelrod's position as a controlling stockholder and director of the publicly held company. Moreover, a shareholder derivative suit against Miracle was pending on another matter, and the corporation was fearful that the complaint would be amended to include the asset sale to Axelrod if the purchase price was suspect. Consequently, in determining the consideration, independent appraisals were made of the machinery, equipment, and real estate to be sold, and this property was sold to Axelrod at the greater of the appraised or book value. The inventory was valued at manufactured cost, and depreciated book value was used for all remaining assets. Moreover, there were lengthy negotiations and bitter arguments with respect to the purchase price to be paid for the publishing business.

Pursuant to an agreement signed February 9, 1971, and dated as of January 1, 1971 (hereinafter referred to as the agreement), Miracle and CPI agreed to sell, and Herbert Axelrod, Evelyn Axelrod, and a corporation named Tropical Fish Hobbyist, Inc.,[1] agreed to purchase substantially all of the assets utilized in Miracle's publishing, binding, and printing operations, consisting of CPI's machinery, equipment, inventory, security deposits and

---

[1] Petitioner T.F.H. Publications, Inc., was formed by Axelrod to become the ultimate purchaser and operator of the business.

advances, certain real property, and Miracle's entire finished goods inventory of books, photo library, copyrights, plates, and specified equipment. The agreement further provided:

1. SALE OF ASSETS

B. The transfer of the assets enumerated in Subparagraph "A" hereof shall be deemed to have been effected as of the close of business on January 1, 1971 and all publishing, binding and printing operations by the Company and/or its subsidiaries after such time and to the date of closing shall, conditional on closing, be under the auspices and direction of Axelrod and shall be deemed to have been carried on for the account of Axelrod who shall be entitled to all income and profits and shall bear all expenses and losses from such operations incurred from such date. Axelrod hereby assumes, subject to closing, all liabilities of the Company resulting from the operations of its publishing, binding and printing operations arising in the ordinary course of business and incurred subsequent to January 1, 1971 and Axelrod hereby agrees to indemnify the Company and to hold it harmless from any claims, actions, suits, damages or proceedings which may be exerted or brought against the Company as a result of such liabilities.

C. All computations necessitated by Subparagraph "B" hereof shall promptly be ascertained jointly by the accountants for the Company and Axelrod, and the net difference adjusted by a cash payment within 30 days from the date of closing.

2. PURCHASE PRICE

A. Axelrod shall pay, subject to adjustment as provided in Subparagraph "2B" hereof, for all of the assets of the Company's publishing, binding, and printing operations to be purchased by him hereunder, as follows:

(1) The sum of $35,000 receipt of which the Company hereby acknowledges;

(2) At the closing, the sum of $272,073 by certified check to the order of the Company;

(3) At the closing, the sum of $70,000 by endorsement and cancellation of demand notes payable by the Company to Axelrod and his wife;

(4) At the closing, the assumption of the Company's mortgage note in the unpaid principal sum of $23,959 held by the Commercial Trust Company of New Jersey with indemnification to the Company with respect thereto;

(5) At the closing, the assumption of liability for $68,009 of the Company's indebtedness secured by liens on the property being conveyed, with indemnification to the Company with respect thereto;

(6) At the closing, the assumption of liability for the Company's indebtedness of $50,177 due as royalties, as of January 1, 1971, to authors and photographers as particularized on a schedule attached hereto as "Exhibit C" and the assumption of all other obligations and duties arising under the royalty agreements to be sold and assigned to Axelrod hereunder;

(7) At the closing, the assumption of all liabilities, duties and obligations for timely delivery of copies of magazines, and if necessary, the reimbursement by Axelrod of subscriptions, as a result of prepaid subscriptions in the amount of $70,336.86 received by the Company prior to January 1, 1971;

(8) At the closing, the assumption of liability for all payments after January

1, 1971, under the service, maintenance and lease agreements listed on a schedule attached hereto as Exhibit "D";

(9) Conditional upon the closing, Axelrod shall accept advertising submitted by the Company and shall publish, print and bind the Company's annual catalogue and make references to the Company's products, as follows:

(i) Axelrod shall accept, print and shall be obligated to publish an average of ten pages per month of advertising by the Company in color in *Tropical Fish Hobbyist* or any other similar magazine to be published by Axelrod at a discount to the Company of 90% of the lowest rate charged by Axelrod to any other advertiser until $400,000 of billings before such 90% discount shall have been invoiced by Axelrod to the Company. Axelrod shall bill the Company at the full amount of such lowest rate and the Company shall deduct 90% of the invoice and remit the balance on the usual terms, it being understood that such 90% discount shall be applied only upon the first $400,000 of billings at which time this obligation by Axelrod shall terminate;

(ii) Axelrod shall supply paper for and shall print and bind the Company's annual catalogue at no cost to the Company for the years 1971, 1972, and 1973, said catalogue to be of a number equal to and in a form similar to the annual catalogues for the years 1969 and 1970.

(iii) Whenever a reference is made by example or otherwise, except by way of paid advertisement, in any book or periodical published by Axelrod concerning any type of pet products, accessories or any other similar item, such reference shall, if of a type of product as is then sold or distributed by the Company, be to the Company's product, which reference shall be at no cost to the Company.

(10) Conditional upon the closing, Axelrod shall grant the Company the right to the use of his name in connection with the Company's products, as follows:

\* \* \* \* \* \* \*

(11) Conditional upon the closing, Axelrod shall, upon the request by the Company, purchase from the Company for cash on July 30, 1972, F.O.B., Jersey City, all finished books in a salable condition not disposed of by the Company prior to June 30, 1972 \* \* \*

(12) Conditional upon the closing, Axelrod shall give credits to the Company in an amount of $65,425, at a rate not to exceed $5,000 per month, for any purchases by the Company, which obligation shall be secured by a demand note of $65,425 due Axelrod and his wife by the Company.

B. A physical inventory is currently being taken by the independent auditors to the Company of all the assets to be sold by the Company to Axelrod hereunder and such auditors are also confirming the amount of liabilities to be assumed by Axelrod hereunder. The books and records of the Company and CPI will be adjusted by such auditors to reflect the results of such physical inventory and confirmation as at January 1, 1971. In the event the value of the assets set forth in subparagraphs 1A(1)(ii), 1A(1)(iii), 1A(1)(iv), 1A(3), 1A(4), 1A(6) and 1A(7) hereof, after adjustment to reflect the results of the physical inventory, shall be less or shall exceed the sum of $470,000, then the amount payable by Axelrod at the closing under subparagraph 2A(2) shall be adjusted accordingly (increased by the amount of the excess or decreased by the amount

of the deficiency). Similarly, in the event the amount of liabilities to be assumed by Axelrod under subparagraphs 2A(4), 2A(5), 2A(6) and 2A(7) hereof, after confirmation, shall be less or shall exceed the sum of $212,481.86 as at January 1, 1971, then the amount payable by Axelrod at the closing under subparagraph 2A(2) shall be adjusted accordingly (decreased by the amount of the excess or increased by the amount of the deficiency).

The agreement further provided that:

This Agreement sets forth the entire understanding of the parties, may not be changed or altered, (including this paragraph) except by a writing executed by the parties and shall be construed and determined in accordance with the laws of the State of New York.

On March 1, 1971, Axelrod, with Miracle's consent, assigned to petitioner and petitioner assumed all of Axelrod's rights and obligations under the agreement. However, except for $65,425 payable by Miracle to Herbert and Evelyn Axelrod on account of a loan they made to Miracle, the Axelrods did not assign to petitioner the right to receive any amounts payable to them on account of loans they made or had made to Miracle. These debts, to the extent provable, remained obligations due to Herbert and Evelyn Axelrod personally.

Paragraph 2A(9) of the agreement pertains to the advertising and catalogs credit which formed part of the purchase price for Miracle's assets. The purpose of the credit was to bridge the gap between the higher price of the assets and the money Axelrod could raise in order to acquire the assets.

Because Miracle's books and records were not up to date when the agreement was executed and because the inventory appraisals had not yet been completed, it was intended that those figures necessary to implementation of the agreement be available to the parties at the closing. The agreement was to serve as the basic format for the sale and purchase of Miracle's assets with the actual figures for inventory, indebtedness, and credits to be supplied at the closing.

Prior to the closing, it was contemplated by the parties that schedules would be prepared by Miracle to reflect adjustments in the valuation of inventory, the amount of indebtedness to be assumed by petitioner, the debits and credits which arose from Axelrod's operation of the business from January 1 through March 16, accrued vacation pay, and officer's pay.

The closing under the agreement began on March 16, 1971. The closing was in two stages and lasted 24 hours. Several

disputes arose at the closing. The disputes were caused in part by the incomplete state of Miracle's books and records and centered around the valuation of inventory, liability for vacation pay and accrued officers pay, and the discovery of expense vouchers submitted by Axelrod for which he had not been reimbursed.

In order to complete the closing, the parties executed an agreement as of March 16, 1971 (hereinafter referred to as the March 16 agreement), which states in relevant portion:

This will confirm our agreement with respect to the adjustments to be made and the method of payment to be received by us under the agreement dated January 1, 1971 and executed on February 9, 1971 between Miracle Pet Products, Inc. ("Miracle") et al.

It is hereby agreed that the values reflected on the closing statement attached hereto as Exhibit A including the additional items valued at $92,753.05 [sic] and not required to be paid at the closing under such agreement, are accepted and agreed to subject, however, to the right of T.F.H. Publications Inc. ("TFH") to return on May 1, 1971 all finished books subject to the Sternco agreement and not sold by TFH by April 30, 1971 and Miracle shall credit TFH with the per book value of such returned books as reflected on the finished book inventory heretofore agreed to by the parties hereto, provided, however, that such credit shall in no event exceed the sum of $10,000.

It is further agreed that all work-in-process of Miracle at outside binderies will be completed and delivered to TFH and billed to TFH at Miracle's cost therefor as at May 31, 1970, (except for any items reflected on the schedule of additional items attached hereto as Exhibit B) plus Miracle's cost to the outside binderies for finishing, payment to be made to Miracle on May 31, 1972 or 60 days after sale by TFH, whichever is sooner * * *

It is further agreed that all other work-in-process, except for work-in-process at Wolff Bookbindery, will be delivered to TFH and billed to TFH at Miracle's cost therefor as reflected on Miracle's books as at May 31, 1970, payment to be made by TFH on May 31, 1972 or 60 days after utilization by TFH * * *

         *     *     *     *     *     *     *

It is hereby further agreed that the schedule of additional items attached hereto as Exhibit B (and reflected on the aforesaid closing statement is [sic] the amount of $92,573.05) is subject to adjustment (i) for valuation of the Wolff work-in-process finished and delivered to TFH on the basis of Miracle's cost therefor as at May 31, 1970 as reflected on Miracle's cost plus the cost of finishing paid to Wolff and (ii) verification of all other items. In addition [sic], Miracle agrees to repurchase on April 1, 1971 all accounts receivable reflected on such Exhibit B not in fact paid to TFH by March 31, 1971.

         *     *     *     *     *     *     *

Miracle further agrees to pay to TFH the sum of $16,000 on July 1, 1971, such sum representing the accrued vacation pay payable to former Miracle employees as at December 31, 1970, which former employees are now employees of TFH.

Attached as Exhibit A to the March 16 agreement was this closing statement:

## SALE OF ASSETS

|  | Amount |
|---|---|
| BASED ON APPRAISED VALUE: | |
| Cornelison Ave. real estate ........................... | $235,000.00 |
| Printing and binding machinery and equipment | 300,000.00 |

| | * | * | * | * | * | * | * |

| ESTIMATED VALUE SUBJECT TO AUDIT: | |
|---|---|
| C.P.I. raw material and work in process inventories ................................................... | 30,960.08 |
| Prepaid items—C.P.I. and M.P.P.: | |
| $2,680 mortgage escrow | |
| $3,740.12 prepaid interest at 12/31/70 on lien balance ......................................... | 6,420.12 |
| Miracle finished goods book inventory .............. | 230,308.60 |
| Photo library .............................................. | 50,000.00 |
| Plates, flats, artwork .................................... | 150,000.00 |
| Sundry fixed assets—C.P.I. and M.P.P. ............. | 22,645.05 |

| | * | * | * | * | * | * | * |

| ITEMS NOT UNDER AGREEMENT (SEE EXHIBIT B) ..... | 92,573.05 | $1,117,906.90 |

## METHOD OF PAYMENT

|  | Amount | |
|---|---|---|
| Downpayment ............................................. | $35,000.00 | |
| Payment at closing ...................................... | 380,000.00 | |
| Officer loan account ..................................... | 70,000.00 | |
| Purchase credit to offset officer loan .............. | 65,425.00 | |
| First mortgage—unpaid principal ..................... | 18,958.98 | |
| Liens on machinery and equipment .................. | 68,009.06 | |
| Accrued royalties ......................................... | 50,177.00 | |
| Unearned subscription income ........................ | 70,336.86 | |
| Advertising and catalogs ............................... | 360,000.00 | [1]$1,117,906.90 |

[1]The figure of $360,000 used for the advertising and catalogs credit was not intended to be an adjustment of the $400,000 credit referred to in the agreement. The amount $360,000 is 90 percent of $400,000 and for that reason the figure was used.

The following was attached as Exhibit B to the March 16 agreement and relating to the "items not under agreement":

| | Charge to T.F.H. | Credits due T.F.H. |
|---|---|---|
| Alan bindery division—payroll for period 1/5/71—1/26/71 | $16,509.05 | --- |
| Litho division—payroll for period 1/6/71—1/27/71 | 10,725.71 | --- |
| T.F.H. publishing division—payroll for period 1/5/71—1/26/71 | 10,764.96 | --- |
| Total payrolls advanced | $37,999.72 | |
| T.F.H. Hobbyist A/C rec | 18,051.09 | --- |
| T.F.H. Hobbyist bank balance 12/31/70 | 10,920.61 | --- |
| Humble Oil | 30.85 | --- |
| Dobbs | 154.35 | --- |
| G. R. Leonard | 42.00 | --- |
| Acrow Janitorial | 47.50 | --- |
| American Building Maintenance | 258.00 | --- |
| X = Check Mark | 258.00 | --- |
| Diners Club | 17.05 | --- |
| Printers service | 75.00 | --- |
| Hospitalization—January | 1,286.63 | --- |
| Consolidated Laundries | 3.75 | --- |
| X = Check Mark | 3.81 | --- |
| Melville Service Corp. | 81.75 | --- |
| Warden | 261.00 | --- |
| Shorties Value Station | 14.10 | --- |
| Humble Oil | 56.55 | --- |
| X = Check Mark | 7.62 | --- |
| Wolfe (pallet inventory) | 140.00 | --- |
| Western Union | 25.00 | --- |
| | 19.74 | --- |
| Moorgate Typesetting | 93.12 | |
| X = Check Mark | 50.76 | |
| Dexion | 2,265.38 | --- |
| Wolfe—WIP finished and delivered to T.F.H. | 55,924.68 | --- |
| Commercial Trust—mortgage paid January 1971 | 2,501.45 | --- |
| Lawson note—paid in January | 361.45 | --- |
| Collected by Miracle for T.F.H. Publications, Inc., A/C per schedule | | $9,803.95 |
| Small orders received and deposited prior to 12/31/70—shipped after 1/1/71 | | 1,024.09 |
| Peter Silver—boiler repairs—M.P.P. insurance claim | | 371.65 |
| Hobbyist—December charges cleared—January | | 31.72 |
| Rent—2d floor—January, February, March | | 1,749.99 |

| | | |
|---|---|---|
| Parking lot .................................................... | | 300.00 |
| Due T.F.H. Hobbyist, Inc.,—rent | | |
| prior to 12/31/70 ...................................... | | 1,291.49 |
| Moneys advanced re: Purchase of Jaguar | | |
| for M.P.P. ................................................... | | 3,705.00 |
| Cash advanced 2/11/71 ............................... | | 20,000.00 |
| Totals ....................................................... | 130,950.96 | 38,277.89 |
| Offset credits ............................................. | 38,277.89 | |
| Net due M.P.P., Inc ..................................... | [1]92,673.07 | |

---

[1]In examining Exhibit B we note that the "net due M.P.P., Inc.," actually totals $92,693.07. The discrepancy between this amount and that shown on Exhibit A of the Mar. 16 agreement is $100.02. However, the discrepancy is of little importance given the purpose of Exhibit 3 and the fact that the $92,573.05 figure listed on Exhibit A was subject to modification as the "due to/due from" account was reconciled.

The closing statement was a joint effort. It was prepared by Miracle's personnel and reviewed by and discussed with Axelrod or his representatives.

From time to time, the Axelrods had made loans to, or expended their personal funds on behalf of, Miracle. These expenditures often occurred during a trip overseas. Upon his return, Axelrod would submit a voucher for the expenditures he had made on Miracle's behalf. The bookkeeping by Miracle with regard to Axelrod's acquisitions with his personal funds or the payment of his expenses with his personal funds, varied. After a voucher or other appropriate documentation was submitted by Axelrod, the accounting depended upon the financial status of Miracle. If the item purchased was significant or the amount substantial, and immediate reimbursement was not contemplated, the obligation was entered as a loan payable. If reimbursement within a short period of time was expected, the obligation was entered as an account payable or an employee advance.[2]

The exact or approximate amount of unreimbursed moneys owed to Axelrod by Miracle was not ascertained as of the closing on March 16. Miracle's books and records did reflect two obligations to Axelrod in the amounts of $70,000 and $65,425 which were accounted for in the March 16 agreement. At the closing itself, Axelrod discovered some of his expense vouchers

---

[2]Because Miracle's books and records prior to 1969 were in poor shape, if substantial amounts were due to Axelrod for periods prior to 1969, it was not likely that the amounts could have been ascertained from the books. Unfortunately, Miracle's books and records have been lost.

Furthermore, in the absence of a voucher from Axelrod, an asset purchased with his funds on behalf of a subsidiary or Miracle which was not transferred to them would not be reflected on the books and, consequently, neither would the obligation to Axelrod.

in a desk drawer which had not been accounted for by Miracle. These amounts apparently were paid to Axelrod by check either at the closing or very soon thereafter. However, Axelrod's trust in the accuracy of Miracle's books with regard to amounts owed to him was shaken. William Shaughnessy, Miracle's comptroller from March 31, 1971, through September 7, 1972, prepared a "due to/due from" account to reconcile the disputed items, and Axelrod's expense vouchers were reflected in the due to/due from account. However, the expense voucher portion of the due to/due from account did not exceed $25,000.[3]

From 1965 through 1971 the Axelrods had issued personal checks on Miracle's behalf or to Miracle totaling approximately $389,001.24. Of these checks the following were issued by Axelrod after January 1, 1971:

| Check No. | Date | Payee | Amount |
|---|---|---|---|
| 1192 | 1/4/71 | Miracle | $85,000.00 |
| 1187 | 1/7/71 | Rudolf Zukal | 92.00 |
| 1195 | 3/22/71 | Vojtech Elek | 50.00 |
| 1197 | 4/11/71 | China Color | 2,878.00 |
| 1198 | 1/13/71 | P.C.C. Hajenius | 226.28 |
| 1200 | 4/3/71 | Cornelders Schoopvart, Mg. | 225.00 |
| 1199 | 2/27/71 | H. Hajenius | 162.00 |
| 1201 | 4/3/71 | Cornelders Shipping Co. | 40.00 |
| 1203 | 3/3/71 | Moorgage Typesetting Co. | 355.25 |
| 1202 | 3/14/71 | Rudolf Zukal | 50.00 |

The check to Miracle for $85,000 probably was required by it for additional working capital.

Exhibit B, attached to the closing statement of the March 16 agreement, reflects as a credit to T.F.H. $20,000 representing a cash advance from T.F.H. to Miracle on February 11, 1971.

After execution of the March 16 agreement, representatives of Miracle and of petitioner would meet periodically to discuss the due to/due from accounts. Although the accounts were not

---

[3]Petitioner argued that Miracle actually owed the Axelrods $296,223.49. It argues that initially Miracle owed the Axelrods $450,256.49 which figure was reduced by $174,033, as per the closing statement attached to the Mar. 16 agreement and which was increased by a $20,000 loan to Miracle on Feb. 18, 1971. However, as respondent notes, there is no credible evidence substantiating the accuracy of petitioner's figures, the business purpose of the expenditures, or that the Axelrods were not reimbursed for some or all of these expenditures. Petitioner relies on a finding of the bankruptcy court that as of Mar. 16, 1971, Miracle was indebted to the Axelrods in the amount of $412,788.69 of which amount only $70,000 was allowed as a credit at closing. Inasmuch as petitioner's attorney admitted that the credit at closing was $174,033, and we do not know the evidentiary basis for the court's finding, we are unable to give this exhibit much, if any, weight.

settled prior to Miracle's petition for bankruptcy filed December 10, 1971, the balance apparently swung from the $92,573.05 balance in favor of Miracle to a balance in favor of petitioner or Axelrod.

The March 16 agreement did not specify that any verified amounts due to the Axelrods from Miracle were to be offset against the advertising and catalogs credit. However, the understanding of the parties was that an offset against this credit could occur under New York law.

Bernard Duke, president of Miracle, wished to assign Miracle's credit with petitioner for advertising and catalogs. However, on or about March 16, 1971, he was advised by Axelrod that an assignment, sale, or other transfer of the credit would not be permitted until all the due to and due from accounts were resolved. Duke subsequently and unsuccessfully attempted to sell portions of the credit during the fall of 1971. However, the due to and due from accounts had not been finalized by that time.

On December 10, 1971, Miracle instituted proceedings for an arrangement under chapter XI of the Bankruptcy Act, and a receiver was appointed. On January 12, 1973, the arrangement proceedings were superseded by an adjudication of bankruptcy and a trustee was appointed. On November 23, 1973, the trustee commenced an action against the Axelrods. On April 10, 1975, an order was filed by the bankruptcy court approving settlement of this litigation. The order states in relevant portion:

that as of March 16, 1971, the Bankrupts were indebted to HERBERT R. AXELROD and EVELYN M. AXELROD in the amount of $412,788.69, of which amount only $70,000 was allowed as a credit at closing, and that as a result of a further review and analysis of their advances, loans and reductions thereof, it was disclosed that HERBERT R. AXELROD and EVELYN M. AXELROD were entitled to $342,788.69 in additional credits against the purchase price which was not known at closing because they relied on incomplete records and information furnished by the Bankrupts relating to the obligations of the Bankrupts to them; * * * that the parties to the agreement agreed that HERBERT R. AXELROD and EVELYN M. AXELROD were to be credited at closing against the purchase price with all obligations then due

to them by Bankrupts, except for a certain subordinated obligation of $65,425;[4] * * *

On its income tax return for its fiscal year ending September 30, 1971, petitioner listed as an "other liability" "deferred advertising income" in the amount of $277,614.50. However, on its books and records for that fiscal year, petitioner reflected "deferred advertising income" in the amount of $343,039. The difference between the two figures results from the offset by petitioner against deferred advertising income on its return of $65,425 which amount was the unreimbursed loan by the Axelrods to Miracle set forth in the February 9, 1971, agreement. On its return for its fiscal year ending September 30, 1972, petitioner reflected the $65,425 loan in its reserve for bad debts and increased the amount of deferred advertising income to $343,039. Petitioner also included advertising income on its returns for its fiscal years ending September 30, 1971, and September 30, 1972, of $16,961 and $5,162, respectively. The $16,961 of advertising income in fiscal 1971 was apparently charged against the $360,000 deferred advertising account to arrive at the net figure of $343,039 above.

In the notice of deficiency dated June 26, 1975, respondent increased advertising income by $343,039 for fiscal 1971 and decreased it by $5,162 for fiscal 1972, with the explanation that a portion of the purchase price of the assets in 1971 was a credit of $360,000 for advertising, and since advertising is considered a service, the assets received in 1971 must be considered payment for future services.

## OPINION

The primary question in this case is the proper tax accounting of the advertising and catalogs credit given by petitioner to Miracle as part of the purchase price for the assets acquired from Miracle. Petitioner, an accrual basis taxpayer, contends that the value of the advertising placed for Miracle should have been included in petitioner's income as its obligation was discharged. On the other hand, respondent has determined that the amount of the credit represents prepaid income to petitioner

---

4Upon advice of counsel, Axelrod did not submit a claim in the bankruptcy action for the debts claimed to be owing him from Miracle. His attorney advised him not to subject himself to the jurisdiction of the bankruptcy court and to preserve his common law right of offset against the advertising and catalogs credit for such claims.

for future services to be rendered to Miracle and must be included in full in petitioner's gross income in the year of purchase.

We must first deal with an evidentiary question raised by respondent at the trial. Relying on the rule established in *Commissioner v. Danielson*, 378 F.2d 771 (1967), by the Third Circuit, to which an appeal of this case would normally lie, respondent objected to all testimony offered by petitioner for the purpose of explaining the meaning of the terminology used in the agreement of sale executed February 9, 1971, and the letter confirming the agreement dated March 16, 1971, and all testimony offered to prove the intent of the parties with respect to certain aspects of the agreements.[5] We received the evidence offered by petitioner subject to respondent's objections.

In *Danielson*, the court had before it the stockholders of a corporation who had sold all of the stock of the corporation to another corporation for a stated consideration of $222 per share plus a stated $152 per share for a covenant not to compete. The petitioners had reported the entire amounts they received as capital gain, arguing that the allocation of a part of the payment to the covenant not to compete had not been realistically bargained for and that the amounts allocated thereto by the buyer were in reality part of the purchase price of the stock. The Third Circuit, reversing the Tax Court, adopted the "following rule of law":

> a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [378 F.2d at 775.] [6]

Fortunately, we do not have to decide whether respondent's objections, based on the *Danielson* rule, should have been sustained or overruled. As a threshold matter, we doubt that the *Danielson* rule would require absolute exclusion of the evidence. The rule which the court characterized as a "rule of law,"[7]

---

[5] We recognize, as does respondent, that the document signed by both buyers and sellers on Mar. 16, 1971, was a permissible clarification of, or amendment to, the agreement executed Feb. 9, 1971, and that both documents should be considered the agreement of the parties.

[6] The rule more frequently used by the Tax Court is the rule enunciated in *Ullman v. Commissioner*, 264 F.2d 305 (2d Cir. 1959), requiring only "strong proof" to vary the terms of a written contract.

[7] But see dissenting opinion. *Commissioner v. Danielson*, 378 F.2d 771, 779 (3d Cir. 1967).

requires a determination by the court of whether the proof offered is sufficient to show that the agreement as written is unenforceable because of mistake, undue influence, fraud, duress, etc. The Court would find it difficult to make such determination unless it received the evidence offered for that purpose. We believe the rule involves applying the evidence offered and received to decide whether it meets the standard established to determine whether the terms of the written agreement should or may be varied.

But, more importantly, we are not convinced by all the evidence offered by petitioner that the terms of the agreement between the parties were ambiguous or that the parties intended anything different than expressed in the agreement with respect to the "advertising and catalogs." Subparagraph 2A of the agreement signed February 9, 1971, provides in detail what the purchaser will pay for the assets sold, a reference being made to adjustments as provided in subparagraph 2B. Subparagraph 2A(9) clearly provides that as part of the purchase price, the purchaser would, among other things, accept, print, and publish in its publications, at a discount of 90 percent, an average of 10 pages per month of advertising from the seller, up to $400,000 of billings at regular prices and would supply paper for, print, and bind the seller's annual catalogs for the years 1971, 1972, and 1973 at no cost to the seller. Subparagraph 2B provides for adjustments of the values set forth in numerous paragraphs of the agreement, dependent upon a physical inventory, but no mention is made of adjusting the amount set forth in subparagraph 2A(9). While, under subparagraph 2A, at the closing Axelrod was required to pay the seller over $300,000 in cash and checks, to cancel a $70,000 note payable to Axelrod and his wife by the company, and to assume various obligations of the company, no mention was made anywhere in the agreement of unascertained liabilities of the company to the Axelrods.

The letter agreement executed by the parties on March 16, 1971, confirmed the February 9 agreement with respect to the adjustments to be made and the method of payment to be received by Miracle. It went on to make specific provisions with respect to some items, but no mention was made of the $360,000 advertising and catalogs item or of any unsubstantiated indebtedness from Miracle to the Axelrods, except as hereafter noted.

In the second paragraph of the letter, it was agreed that the values reflected on Exhibit A, the closing statement attached, including the items valued at $92,753.05 and not required to be paid at the closing, were accepted and agreed to, subject to the right of T.F.H. to return and receive credit for certain books it could not sell. In the sixth paragraph of the letter, it was agreed that the schedule of additional items attached as Exhibit B, and reflected on the closing statement in the amount of $92,573.05, was subject to adjustment (1) for valuation of the Wolff work-in-process finished and delivered to T.F.H. and (2) *"verification of all other items."* (Emphasis added.) The closing statement attached as Exhibit A first listed the assets being sold and their appraised or estimated value subject to audit, and then listed the items comprising the method of payment and the amounts thereof. All of the amounts listed under the method of payment, except one, including the $360,000 for advertising and catalogs, were typed in advance. The amount of the payment at closing had been left blank, with the balancing figure of $380,000 filled in by pen, thus increasing this figure from the $272,073 mentioned in the agreement of February 9. The amounts of several items in the assets-sold table were filled in with a pen and the last item on the list was changed from "Additions to Inventory" to "Items not under agreement—see Exhibit B—$92,573.05." Exhibit B was a handwritten tabulation of various identified charges to T.F.H. and credits due T.F.H., which reflected a balance of charges to T.F.H. in the amount of $92,573.05. The tabulation makes no reference to any unknown obligations due from Miracle to the Axelrods.

Petitioner relies primarily on the clause appearing in the sixth paragraph of the letter agreement, which we have emphasized above, and the oral testimony of Axelrod and some of his representatives at the closing to show that the agreement with respect to the advertising and catalogs item was left open and was a plugged figure against which the unascertained obligations of Miracle to the Axelrods could be offset. This reliance is misplaced. First, the clause relied upon appears to refer to the items appearing on Exhibit B ($92,573.05) and would have to be lifted entirely out of context to have any application to the advertising and catalogs account. Secondly, the agreement of sale was very complex and detailed, and the attorneys appear to have been careful to document everything of importance. We

cannot imagine that an item involving as much as $360,000 would be overlooked. Axelrod's letter of resignation to Miracle made no mention of any liabilities due him from Miracle, while Evelyn Axelrod's resignation specifically excepted any amounts due her from Miracle from the release. If Miracle owed Axelrod anywhere near $360,000, we cannot imagine that there would be no record of it or that Axelrod would have agreed to and did pay Miracle $405,000 in cash at the closing. According to the testimony, the $92,573.05 account was used after the closing to charge and credit the parties with items discovered after the closing, and we assume that that account was intended to be used for any adjustments to be made after the closing. Apparently, Axelrod made no claim for this indebtedness subsequent to the closing and throughout Miracle's bankruptcy proceedings until late 1974. We also note that the advertising and catalogs account was used by the parties for the purpose indicated in the agreement during 1971 and 1972 and no other charges were made against it. And finally, Axelrod did not assign to T.F.H. any unascertained obligations due him from Miracle. It is difficult to understand, without dropping the corporate veil, how any indebtedness of Miracle to Axelrod could be offset against T.F.H.'s obligation to provide advertising to Miracle. See *Lazisky v. Commissioner*, 72 T.C. 495 (1979).

For these and other reasons, we conclude that there is insufficient proof that the agreement of sale, relative to the advertising items, was anything other than it purported to be, whether we test it under the *Danielson* rule or the "strong proof" rule of *Ullman v. Commissioner*, 264 F.2d 305 (2d Cir. 1959), or the substance-over-form rule which has been applied in many tax cases. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Pittsburgh Realty Investment Trust v. Commissioner*, 67 T.C. 260 (1976).

We conclude further that under the agreement the buyer became obligated to provide Miracle with advertising in its publications, under the terms stated therein, at a 90-percent discount as a part of the purchase price of the assets transferred to petitioner.

Having concluded that petitioner agreed to provide advertising over a period of time as part of the purchase price of assets it received in 1971, we must now determine whether that part of

the transaction produced taxable income to petitioner in 1971 and, if so, how much.

Respondent determined that a portion of the purchase price of Miracle's printing and publishing assets acquired by petitioner was a credit of $360,000 for advertising (the 90-percent discount on $400,000 of billings), and since advertising is considered a service, the assets petitioner received in 1971 must be considered payment for future services. Relying primarily on *Schlude v. Commissioner,* 372 U.S. 128 (1963), and *American Automobile Association v. United States,* 367 U.S. 687 (1961), respondent argues that the prepayment for future services thus established is all taxable in the year of receipt, i.e., 1971. Petitioner argues that, if the credit for advertising was not offset by obligations due Axelrod by Miracle, and if the granting of the credit produced income to petitioner, such income should be deferred and included in taxable income only when the credit was used.

With regard to petitioner's claim that the credit was offset by amounts due Axelrod by Miracle, we have indicated above that we have found no proof that such amounts were intended to be offset against this credit or that any steps were taken to do so. And even if under common law principles of offset the purchaser would have been able to offset against the credit for advertising amounts due from the seller to the purchaser, such principle is not applicable here. The purported obligations were not assigned by Axelrod to petitioner. And even if an offset had been intended and permitted, we have no acceptable evidence of how much was due Axelrod.[8]

In its original brief, aside from the offset argument, petitioner does not appear to question that the granting of the credit as part payment for the printing and publishing assets gave rise to taxable income at some time, but disputed the timing of it. But in its reply brief, petitioner argues that, unlike the taxpayers in *Schlude v. Commissioner, supra, American Automobile Association v. United States, supra,* and *Wide Acres Rest Home, Inc. v. Commissioner,* T.C. Memo. 1967–79, relied on by respondent, the petitioner here (a) did not receive either cash or cash equivalents, (b) did not have free and unrestricted use of the assets

---

[8]We cannot accept the order of the bankruptcy court entered in 1975 approving a settlement of the trustee's suit against Axelrod as proof of the amounts because we have no idea whether the court was simply approving a settlement or, if it was making independent findings, on what it based such findings.

received, (c) did not receive an advance payment arising from its daily operation of its business, and (d) did not sell assets; therefore, it did not receive income.

At first blush, it is difficult to equate the purchase of business assets with the receipt of income. Cf. *Oxford Paper Co. v. Commissioner*, 15 T.C. 361 (1950), revd. 194 F.2d 190 (2d Cir. 1952). Closer analysis, however, supports such a conclusion. In this transaction, petitioner received tangible assets having an agreed-upon value. As part payment therefor, petitioner agreed to provide advertising for the seller at a discount. The income petitioner would have received from charging the going price for the advertising would have been taxable business income to petitioner. A part of the value of the assets received was for the charge that would have been made except for the discount, so petitioner received payment in the form of tangible assets for the advertising to be supplied in the future. Thus, the value of the tangible assets received in lieu of the cash normally received from the furnishing of advertising must be accorded the same status as would the cash; that is, taxable income.

While we recognize that in *Schlude* and *American Automobile Association* the taxpayers received cash or its equivalent for services to be provided in the future in the regular course of their businesses, we fail to understand why this should make the tax consequences different from the tax consequences of the transaction here involved. Petitioner here received assets, instead of cash, for advertising services to be provided in the future in the regular course of its business. The fact that petitioner received assets instead of cash should not differentiate the cases. Petitioner received full control of the assets with no restrictions on their use—presumably it could have reduced an appropriate part of the assets to cash whenever it chose to do so. And the fact that petitioner received its gain in a purchase transaction should not change the character of the economic benefit. We find that the granting of the advertising credit did produce income to petitioner. See *Alstores Realty Corp. v. Commissioner*, 46 T.C. 353 (1966); *Wide Acres Rest Home, Inc. v. Commissioner, supra.*

Any analysis of this problem must begin with a trilogy of Supreme Court decisions. These decisions have established the general rule of thumb that deferral of prepaid income for services to be rendered by an accrual basis taxpayer is not

permissible for income tax accounting purposes. While this result is not a rule of law, *Automobile Club of Mich. v. Commissioner,* 353 U.S. 180 (1957), *American Automobile Association v. United States, supra,* and *Schlude v. Commissioner, supra,* pose definite roadblocks in the path of deferral.

In *Automobile Club of Mich. v. Commissioner, supra,* membership dues paid annually in advance were included in income as the months in the year to which the dues related elapsed. These funds were available and were used for general corporate purposes. Conceding that the claim-of-right doctrine was satisfied, the taxpayer argued that its method of accounting clearly reflected its income. The Supreme Court held that the Commissioner had not abused his discretion in determining that it did not do so. In so holding, the Supreme Court noted "The pro rata allocation of the membership dues in monthly amounts is purely artificial and bears no relation to the services which petitioner may in fact be called upon to render for the member."

*American Automobile Association v. United States, supra,* involved a similar accounting procedure. Again, the Supreme Court held that the Commissioner had not abused his discretion by disapproving the deferral of prepaid dues, even though the taxpayer had proof that its procedure was in accord with generally accepted accounting principles and that its allocation of cost of member service was justified by experience. The Supreme Court also noted the retroactive repeal of sections 452 and 456, which had allowed the accounting method utilized by the taxpayer, and the adoption of section 455, which permits the deferral of prepaid subscription income. This legislative action indicated to the Court that Congress recognized the "complications inherent in the problem and its seriousness to the general revenue." (367 U.S. at 697.) The Supreme Court felt the congressional action to be further justification for affirming the Commissioner's determination. That the Court majority considered and rejected most of the arguments for deferral made by petitioner in this case is clear from a reading of the dissenting opinion in the *American Automobile Association v. United States* case, 367 U.S. at 698.

In *Schlude v. Commissioner, supra,* the Supreme Court was faced with an accrual basis taxpayer who operated a dance studio. Dancing lessons were offered under either of two basic contracts. The cash plan contract required the student to pay the

entire downpayment in cash at the time the contract was executed with the balance due in installments. The deferred payment contract required only a portion of the downpayment to be paid in cash. The remainder of the downpayment was due in stated installments, and the balance of the contract price was to be paid as designated in a negotiable note signed at the time the contract was executed. The contracts provided that the tuition was nonrefundable and the contract noncancellable. The contracts prescribed a specific number of lesson hours but there was no schedule of specific dates, which were arranged from time to time as lessons were given. When a contract was entered into, a deferred income account was credited for the total contract price. At the close of each fiscal period, student record cards were analyzed and amounts allocable to the lessons given were deducted from the deferred income account and reported as earned income on the financial statements and the income tax return. Upholding the Commissioner's determination that this method of accounting did not clearly reflect income, the Supreme Court stated in part at pages 135–136:

> Plainly, the considerations expressed in *American Automobile Association* are apposite here. * * *
>
> * * * Relying upon *Automobile Club of Michigan v. Commissioner* * * * the Court [in *American Automobile Association*] rejected the taxpayer's system as artificial since the advance payments related to services which were to be performed only upon customer's demands without relation to fixed dates in the future. The system employed here suffers from that very same vice, for the studio sought to defer its cash receipts on the basis of contracts which did not provide for lessons on fixed dates after the taxable year, but left such dates to be arranged from time to time by the instructor and his student. * * * the studio was uncertain whether none, some or all of the remaining lessons would be rendered. Clearly, services were rendered, solely on demand in the fashion of the *American Automobile Association* and *Automobile Club of Michigan* cases. [Fn. ref. omitted.]

Until the decision by the Seventh Circuit in *Artnell Co. v. Commissioner*, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), this Court had cited the Supreme Court cases as establishing a rule of nondeferral, e.g., *Cox v. Commissioner*, 43 T.C. 448, 455–456 (1965); *William O. McMahon, Inc. v. Commissioner*, 45 T.C. 221, 226 (1965); *Decision, Inc. v. Commissioner*, 47 T.C. 58, 62 (1966); *Angelus Funeral Home v. Commissioner*, 47 T.C. 391, 399 (1967); see also *S. Garber, Inc. v. Commissioner*, 51 T.C. 733, 735–736 (1969).

The Seventh Circuit in *Artnell Co. v. Commissioner, supra,* has held that the nondeferral rule is not absolute. In that case, petitioner had acquired the stock in Chicago White Sox, Inc., a professional baseball team. White Sox then liquidated in the seventh month of its taxable year, but Artnell Co. continued to operate the team. As of May 31, 1962, the balance sheet of White Sox showed as deferred unearned income that part of the amount received for season tickets, advance single admissions, radio, television, and season parking books, allocable to games to be played after May 31, 1962. As the games were played, Artnell Co. took into income the amounts of deferred unearned income allocable to each. The Commissioner determined that the White Sox income tax return for its short taxable year should have included the deferred unearned income. The Tax Court, relying on the discussion of congressional action in *American Automobile Association,* stated that it believed the Supreme Court would have upheld the Commissioner's exercise of discretion regardless of the method used by the taxpayer for deferring prepaid income. (See 48 T.C. at 416–417.) The Seventh Circuit disagreed and stated:

> It is our best judgment that, although the policy of deferring, where possible, to congressional procedures in the tax field will cause the Supreme Court to accord the widest possible latitude to the Commissioner's discretion, there must be situations where the deferral technique will so clearly reflect income that the Court will find an abuse of discretion if the Commissioner rejects it. [400 F.2d at 984–985.]

The case was remanded to this Court for a determination of whether the method of accounting clearly reflected the income of the White Sox in its final taxable year. On remand, we defined the issue as to whether the White Sox' treatment of its expenses was consistent with the deferral of the prepaid seasonal income. Although the deferral treatment of its expenses was not perfect, we found that petitioner's method of accounting more clearly reflected income for the short taxable year than did the method proposed by respondent. *Artnell Co. v. Commissioner,* T.C. Memo. 1970–85. Since *Artnell Co.,* this Court has indicated that it will not follow the rationale of that case unless the facts present a certainty, of performance or fixed dates, such as was presented in *Artnell Co.* See *Standard Television Tube Corp. v. Commissioner,* 64 T.C. 238, 242 (1975);

*Allied Fidelity Corp. v. Commissioner*, 66 T.C. 1068, 1077–1078 (1976), affd. 572 F.2d 1190 (7th Cir. 1978).[9]

With this background as guidance, we must uphold respondent's determination that the credit be included in petitioner's income in full in 1971, the taxable year of purchase. Notwithstanding petitioner's efforts to persuade us to the contrary, we believe that *Schlude* controls our decision. As in *Schlude*, petitioner's obligation to perform the publishing services for Miracle was subject to Miracle's demand. Although the pertinent provision in the agreement refers to a monthly average of 10 pages of advertising, there is no requirement that Miracle place any advertising at all in petitioner's publications.[10] Consequently, certainty of performance is lacking as well as a predetermined schedule of performance. Petitioner's argument that *Schlude* is distinguishable because the advertising and catalogs credit did not arise from petitioner's regular business operations is unavailing. The transaction should be viewed in two steps. The first step is an asset purchase which is a completed transaction for income tax purposes. The second step is the performance of the advertising services for which petitioner has received full value in the form of property. In that sense then, petitioner is rendering services in the normal course of its business. Moreover, petitioner's contention that to be applicable *Schlude* requires the receipt of cash or its equivalent for the services to be performed is a misreading of that decision and a misunderstanding of the cash equivalency concept. Cash equivalency becomes relevant when a cash basis taxpayer receives intangible property such as promissory notes or contract rights. Because the taxpayers in *Schlude* received contracts and notes for these future dancing lessons, the question of cash equivalency was important in determining the amount of income received. But where tangible property is received in prepayment for services, the issue of cash equivalency is moot. The argument that the *Schlude* rationale does not apply to the deferral of prepayment for goods is forestalled by our decision to the contrary in *Farrara v. Commissioner*, 44 T.C. 189 (1965). And finally,

---

[9]This Court, in *Collegiate Cap & Gown Co. v. Commissioner*, T.C. Memo. 1978–226, has followed the *Artnell Co. v. Commissioner*, 400 F.2d 981 (7th Cir. 1968), approach through application of the rule set forth in *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

[10]Because of Miracle's bankruptcy, petitioner may never be called upon to honor the advertising credit given Miracle except for the advertising rendered in 1971 and 1972.

petitioner's contention that it did not receive the publishing assets under a claim of right because of its obligation to Miracle is without merit.

*Decision will be entered for the respondent.*