T.C. Memo. 2000-212

UNITED STATES TAX COURT

RICHARD D. NELSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14125-98.                    Filed July 11, 2000.

<u>Stanley Hagendorf</u> and <u>Wayne Hagendorf</u>, for petitioner.

<u>William R. McCants</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax and accuracy-related penalties under section 6662[1] for the 1991, 1992, and 1993 taxable years as follows:

_____

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable years under consideration.  Rule references are to the Tax Court's Rules of Practice and Procedure.

|       |            | Penalty    |
| Year  | Deficiency | Sec. 6662  |
| ----- | ---------- | ---------- |
| 1991  | $125,883.04 | $25,176.61 |
| 1992  | 142,707.58 | 28,541.52  |
| 1993  | 197,963.79 | 39,592.76  |

We consider the following issues: (1) Whether petitioner has established a passthrough loss by showing his S corporation's entitlement: (a) to accrue and deduct a $1.5 million legal fee for 1991; (b) to deduct $5,500 monthly payments made in connection with a bingo business; and (c) to deduct claimed supplies expenses for the 1991, 1992, and 1993 taxable years; (2) if petitioner establishes a passthrough loss, whether petitioner had basis in his wholly owned S corporation so as to allow passthrough losses for his individual taxable years;[2] and (3) whether petitioner is liable for a negligence penalty under section 6662(a) for 1991, 1992, and/or 1993.

## FINDINGS OF FACT

At the time his petition was filed, petitioner resided in Florida. Petitioner's wholly owned corporation November, Inc. (November), was incorporated in Virginia on December 19, 1988, and for its 1989 through 1997 taxable years, reported, as an S corporation, income and deductions under the accrual method of accounting. In the late 1980's petitioner became involved with

---

[2] Respondent bears the burden of showing that petitioner did not have basis because respondent raised the question of basis in his trial memorandum and assumed the burden in accord with this Court's rules.

Sherman and Elaine Lichty (the Lichtys) and Hilton Enterprises, Inc. (Hilton), in connection with a bingo operation.

Leonard Morrison (Morrison) and the Lichtys established a successful bingo operation during the early 1980's at a location on Warwick Boulevard in Newport News, Virginia (Warwick location), but they were prosecuted for fraud, and they were required to divest their interest in the bingo operation as a requirement of probation. Initially, the divestment was accomplished by interposing Michael Anderson (Anderson), Morrison's son-in-law, to serve the Lichtys' and Morrison's interests. Anderson, due to personal problems, did not effectively operate the bingo operation, and late in 1988, the Lichtys and Morrison were referred to petitioner by Mark Gilbert (Gilbert), a mutual friend.

Gilbert placed petitioner into the bingo business opportunity as a straw for the Lichtys. In accord with a December 18, 1988, purchase agreement, it appeared that November had purchased the assets of Hilton Enterprises, Inc. (Hilton), in order to operate the bingo business at the Warwick location, a property leased by the Lichtys. Gilbert also became involved in the bingo operation and received a salary. In addition, Gilbert owned an adjacent parking lot used in conjunction with the bingo business operations. Petitioner was to receive a $50,000 salary that was to be increased after 1 year. Prior to his involvement

in the bingo operation, petitioner had reported annual earnings to respondent of about $5,000. Petitioner's involvement in the bingo business, however, was expected to generate $150,000 per year for petitioner.

Petitioner and November jointly executed a $450,000 promissory note, dated January 5, 1989, in favor of the Lichtys and a sublease for the Warwick property. The note was secured by petitioner's stock in November and all of the assets used in the bingo business and called for $5,000 monthly payments to the Lichtys. The transaction was, in part, structured to appear to be a sale and also to permit the monthly note payments to be reflected as rent so as to be deducted by November and/or petitioner from the bingo-related income.

In substance, petitioner was acting as a shill for the Lichtys and Morrison because of their probation requirements. The note and "lease" were intended as a contrivance that permitted the Lichtys and Morrison to remain financially involved in the bingo business and to maintain some control over petitioner's involvement. In that regard, Gilbert assisted the Lichtys and Morrison by overseeing petitioner's involvement in the bingo operation. The Lichtys' lease on the Warwick property expired January 31, 1991, and during 1990 they found a new bingo location, owned by Lockwood Brothers, Inc., on Chestnut Avenue (the Chestnut property).

The Chestnut property had been used as a fish processing factory, and November expended approximately $400,000 to improve and make the Chestnut property suitable for the bingo operations. November expended $222,171, $166,553, and $25,915 during 1990, 1991, and 1992, respectively, to convert it into a bingo operation. Based on those expenditures, November claimed depreciation on a 10-year basis equal to the term of the Chestnut property lease in the respective amounts of $30,545, $40,168, and $41,464 for the 1991 through 1993 tax years.

The Lichtys and November, during October 1991, jointly entered into a lease of the Chestnut property. The Lichtys' involvement was through their corporate entity, EDL Properties, Inc. (EDL). Under the terms of the lease, the Lichtys' entity was obligated for a $6,793.36 monthly rental payment for the Chestnut property, beginning February 10, 1991.

Disagreements arose between petitioner/November and the Lichtys and Gilbert concerning the bingo operation, and the Lichtys advised petitioner that it was not likely that he would be allowed to continue as the bingo operator. On February 1, 1991, petitioner and November filed suit against the Lichtys and others, treating the sublease of the property and note for $450,000 as rightful and seeking specific performance and a temporary injunction. Petitioner sought exclusive use of the Chestnut property for the bingo operation and to keep the Lichtys

and others from interfering. In May 1991, the suit was settled with petitioner and November emerging with the right to continue the operation of the bingo business. Under the settlement, EDL entered into a 10-year sublease of the Chestnut property with November.

Petitioner/November had hired attorney William M. Krieger (Krieger) on a contingent fee basis to represent them in the above-described lawsuit. As a result of the successful settlement of the suit, it was determined that the value of the bingo business was approximately $4.5 million and that Krieger was entitled to a $1.5 million fee. November and petitioner, during June 1991, executed a promissory note to Krieger for $1.5 million that was payable from bingo income and wholly dependent on the success of the bingo operations. The note did not have a maturity date and was payable in monthly amounts computed in accord with a separate agreement between the parties. The agreement limited petitioner's salary to an amount not exceeding $65,000 until such time as Krieger's $1.5 million note, including interest, was paid in full. The note was non-negotiable and could not be discounted, transferred, assigned, or owned by anyone other than Krieger and his immediate heirs. Under the agreement and note, November was obligated for and did pay to Krieger one-third of the pretax profit, which amounted to

$56,409.11, $110,317.07, $130,739.49, $75,636.22, and $56,492.60 for the years 1991, 1992, 1993, 1994, and 1995, respectively.

As an accrual basis reporter, November claimed a $1 million deduction for Krieger's fee for its 1991 reporting period, but petitioner now claims the entire $1.5 million. November paid the $6,793.36 rent for the Chestnut property for March 1991 and paid amounts for rent and other items into the court during the pendency of the lawsuit. After the lawsuit and pursuant to the settlement between November/petitioner and the Lichtys and others, November made monthly payments of $12,293.36 (the equivalent of $6,793.36 rent on the Chestnut property plus $5,500) to the Lichtys' entity. For the 1991, 1992, and 1993 reporting periods, November paid $147,235.49, $145,962.73, and $147,520, consisting of the above-described payments.

Respondent disallowed the $1 million deduction that had been claimed for legal fees. The deduction was disallowed on the alternative grounds that economic performance had not occurred or that the fee was a capital, nonamortizable expenditure. Respondent also determined that the improvements to the Chestnut property were not currently deductible and that they should be capitalized and depreciated during a 31.5-year recovery period under the modified accelerated cost recovery system (MACRS). Under respondent's determination, November would be entitled to depreciation deductions of $7,274, $12,376, and $13,165 for 1991,

1992, and 1993, respectively. Respondent also disallowed about $5,500 of the $12,293 monthly payments that November had claimed as rent on the basis that those amounts were capital payments that were being paid to acquire the bingo business.

Petitioner, on his 1991 income tax return, claimed a $753,728 flowthrough loss from November, his S corporation. Respondent, due to his determination denying certain of November's claimed deductions, in turn, disallowed petitioner's claimed loss. Petitioner claimed a carryover of the 1991 loss to his 1992 and 1993 income tax returns. Respondent did not make the determination, in the deficiency notice, that petitioner had insufficient basis in his S corporation (November) to claim the loss.

November's capital stock was issued for $1,000 and did not increase. Loans from shareholders, at one time, approached $4,500 but decreased to zero by the time of the years under consideration. Petitioner recognized $79,768 and $20,099 of passthrough income from November, as reflected on Forms 1120S, Schedules K, Shareholders' Shares of Income, Credits, Deductions, Etc. (Form 1120S) for the 1989 and 1990 tax years. November's balance sheets reflect $1,000 in equity, and the loans to shareholders on November's balance sheets reflected $96,007 as of December 31, 1990, $143,548 as of December 31, 1991, $332,029 as

of December 31, 1992, $578,231 as of December 31, 1993, and $768,223 as of December 31, 1994.

## OPINION

The parties agree that, prior to his bringing suit against the Lichtys, petitioner was a shill for others and that his apparent ownership of the bingo operation was, most likely, a sham. In addition, petitioner asserts that the existence of his S corporation should be disregarded and that he should be permitted to report the income or claim the losses directly, instead of passing them through the entity. As an alternative, petitioner argues that he "was not the beneficial owner of the equity interest in November or the Bingo operations during the years in issue, but was merely a 'front man', a 'straw', or 'shill'". Under the alternative argument, petitioner asks us to hold that he was not entitled to any income from November.[3] Finally, petitioner counters respondent's position by contending that the disputed adjustments to his S corporation were in error and that he had basis to claim a passthrough loss.

Petitioner's argument that we disregard his wholly owned corporate entity (November) must fail. Petitioner first raised this argument on brief, in a posttrial setting. Although

[3] We summarily dispense with petitioner's argument that no income should be attributable to him because he received varying amounts of money and/or benefits from and/or through his S corporation's bingo activities.

respondent argues that petitioner did not have ownership in the bingo operation prior to the settlement of the lawsuit, neither party, prior to the submission of the briefs, contended that November should be disregarded as an entity. Under these circumstances, petitioner's attempt, for the first time on brief, to disavow the existence of November would be most prejudicial to respondent and will not be permitted. See, e.g., Estate of Horvath v. Commissioner, 59 T.C. 551, 556 (1973).

Even if petitioner had been permitted to pursue his contention that the corporate entity be disregarded, on the record here he would have failed.[4] Petitioner created this corporate entity, caused it to file returns, and reported passthrough losses from the entity on his individual return. In addition, the existence and form of the S corporation had not been questioned by respondent. Importantly, the existence of November is in no way dependent upon whether it or petitioner had an ownership interest in the bingo operation. November was the financial conduit for petitioner's involvement in the bingo business, whether or not he or November had an ownership interest in the bingo business. Additionally, the deficiencies under

---

[4] A party seeking to disavow the form of its own transaction may be required to present "strong proof" that the substance differs from the form. Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Coleman v. Commissioner, 87 T.C. 178, 202 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987).

consideration arose, in great part, after petitioner had settled the litigation and was entitled to continue operating the bingo business.  Finally, where there has been substantial business activity by a corporation, it would be difficult to show that the corporation is a taxpayer's alter ego or merely a nominee for purposes of Federal taxation.  See Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949); Commissioner v. State-Adams Corp., 283 F.2d 395 (2d Cir. 1960).  Although petitioner was a shill or front for the Lichtys and others, November was an active and operating entity that, in the course of conducting the bingo business, received income and issued checks for bingo business expenditures.  Moreover, November was a named plaintiff in the legal proceeding with the Lichtys. November played too large and vital a role to be disregarded.

We proceed to consider whether petitioner has shown that respondent's determination disallowing certain of November's deductions was in error.  We first consider the 1991 legal fee that was incurred in connection with litigation involving the bingo operation.  November originally claimed a $1 million deduction with respect to the $1.5 million fee for which an agreement and note were executed with/to Attorney Krieger. Petitioner contends that the entire $1.5 million fee should be deductible by an accrual basis taxpayer because it was an

ordinary and necessary business expense.[5]  Conversely, respondent
contends that the legal fee was a capital expenditure and,
accordingly, not deductible.  Alternatively, respondent contends
that if the attorney's fee is not a capital expenditure, November
would not be entitled to deduct the entire amount for failure to
meet the all events test.

Should the $1.5 Million Legal Fee Be Capitalized?

Respondent, relying on INDOPCO, Inc. v. Commissioner, 503
U.S. 79 (1992), argues that the $1.5 million legal fee is a
nonamortizable capital expenditure.  Petitioner, however,
contends that under section 162 the legal fee was an ordinary and
necessary expense that was incurred in carrying on a trade or
business.  Respondent counters that section 263 provides that no
deduction is allowable for amounts paid for permanent
improvements or betterments made to increase the value of any
property or estate.  Respondent, in support of his determination,
contends that petitioner instituted suit for the purpose of
asserting ownership over the bingo operation, and, ultimately, he
emerged as the owner, subject to his making certain payments to
the Lichtys and others, including Kreiger, petitioner's attorney.

---

[5] Petitioner also points out that respondent did not allow
the amounts actually paid by November to the attorney during
1991, 1992, and 1993.  In that regard, respondent's determination
that the expenditure should be capitalized would not depend on
the method of accounting or when the amounts were actually paid.

The situation we consider is quite novel. Initially, petitioner acted as a front for others who were constrained not to reveal their ownership interests. Under his agreement with the true owners, petitioner was to receive a $50,000 salary (ten times more than he had reported as income in the past), with the potential to make $150,000 in exchange for acting as owner and for operating the bingo business. It was not until the Lichtys advised petitioner that they were going to remove him from that position that petitioner hired Krieger and sought to protect his income stream under the agreement. Petitioner's lawyer advised him to approach the litigation by attempting to perfect the ostensible ownership that he had been permitted by the true owners. Petitioner's attorney believed that it was the Lichtys' inability to assert their ownership that was the main reason for petitioner's success in arriving at a settlement under which he was able to continue receiving income from the bingo operation.

Respondent's position that the legal fees were not deductible in the ordinary course of business and constitute a capital expenditure does not fit the unique factual circumstances here. In substance, petitioner was not seeking to perfect control and/or ownership of the bingo operation. Instead, he knew that he was merely a shill or front for others with a promise of income for acting in that capacity and managing the business. In effect, he was seeking to keep the true owners from

removing him from his position and from stopping the flow of his earnings or income stream.

By seeking to enforce the ostensible terms with the true owners, petitioner protected his income earning position and kept the true owners from asserting their authority in the future. Petitioner already owned the capital entity (November) that was permitted to continue the operation of the bingo business. He did not perfect his ownership in November, and he did not acquire the lease to either of the locations where the bingo business was operated. Accordingly, respondent's reliance on INDOPCO Inc. v. Commissioner, supra, is in apropos. Petitioner had entered into an agreement with the Lichtys, et al. for a position where he would receive $50,000 to $150,000 per annum in exchange for his services, including serving as a shill or front for the Lichtys. Under that agreement, petitioner would also have been entitled to some equity at a future time.[6] When the Lichtys attempted to default on their part of the agreement by attempting to remove petitioner from his position, he sued. Accordingly, petitioner did not incur the legal fee to produce a long-term benefit, he incurred it to protect his existing right to an income stream. Such expenditures are ordinary and necessary business expenses

_____

[6] We note that petitioner's situation after the settlement was substantially similar to his situation before. He operated a bingo business and paid the Lichtys $5,000 before and $5,500 per month after the settlement. In form and substance nothing else changed.

within the meaning of section 162, and we so hold.  See

Commissioner v. Heininger, 320 U.S. 467 (1943).

Respondent also argues that petitioner is not entitled to

deduct the face amount of the note to Krieger on the ground that

all of the events had not occurred which determine the fact of

liability and because the value of the note could not have been

determined with reasonable accuracy (the "all events test").

Respondent also relies on section 461(h)(1), arguing that it

would apply to limit the deductible amount, even if the all

events test is met, to an amount for which economic performance

has been met.[7]

There is no dispute that petitioner and November were

obligated to Krieger on a note in the face amount of $1.5 million

and that Krieger had successfully prosecuted petitioner's

litigation to a conclusion (settlement) during the taxable year.

There was no performance left on the part of Krieger, and

petitioner and November were obligated to make payment.

Petitioner and November, however, were not required to make

payments on the note unless the bingo operation was profitable.

Further, the note did not have a fixed payment date and could

---

[7] In addition, respondent argues that sec. 1.461-1(a)(1), Income Tax Regs., prohibits the deduction of any expenditure which results in the creation of an asset having a useful life extending beyond the close of the taxable year.  Because we have decided that the litigation did not result in the creation of an new asset, we need not address the effect of the cited regulation.

have remained unsatisfied for an indefinite period of time.  In accord with the note and the terms of an accompanying agreement, Krieger was paid $429,594.49 during the first 5 years after the settlement ($56,409.11, $110,317.07, $130,739.49, $75,636.22, and $56,492.60 for the years 1991, 1992, 1993, 1994, and 1995, respectively).

Accordingly, although it was agreed that Krieger was entitled to $1.5 million, there was no assurance that the bingo operation would generate income sufficient to satisfy the note. The conditional nature of the note and its indefinite term prevent the all events test from being satisfied.  See, e.g., Restore, Inc. v. Commissioner, T.C. Memo. 1997-571, affd. per curiam 174 F.3d 203 (11th Cir. 1999).  Even if these circumstances did facially comply with the all events test, the allowance of a $1.5 million deduction for November's 1991 year when payments on the note are conditional and extend over an indefinite period of time would result in a distortion and fail to match November's income and deductions.  Cf. Ford Motor Co. v. Commissioner, 102 T.C. 87 (1994), affd. 71 F.3d 209 (6th Cir. 1995).

Accordingly, we hold that November was not entitled to deduct $1.5 million for legal fees for its 1991 year, but that it is entitled to deduct the payments to Krieger in the year of each payment.

Whether November Is Entitled To Write Off or Depreciate Over the 10-year Term of the Lease The Improvements Made to the Chestnut Property

The Chestnut property had been used for processing fish and needed substantial improvements before bingo operations could commence.[8] November expended $222,171, $166,553, and $25,915 during 1990, 1991, and 1992, respectively, to convert it into a bingo operation. Based on those expenditures, November claimed depreciation on a 10-year basis (equal to the 10-year term of the lease) in the respective amounts of $30,545, $40,168, and $41,464 for the 1991 through 1993 tax years. Respondent determined that petitioner was entitled to use a 31.5-year recovery period under the MACRS, resulting in allowances of $7,274, $12,376, and $13,165, respectively. On brief, petitioner also claimed that November would, alternatively, be entitled to deduct the entire expenditure (about $400,000) as lease acquisition cost that would not be subject to the MACRS requirements.

Petitioner had relied on section 1.162-11(b), Income Tax Regs., which held that lessees may be entitled to use the length of the lease as the recovery period for leasehold improvements. Respondent correctly points out that section 168(i)(8) (added by the Tax Reform Act of 1986) made the above-referenced regulation

----

[8] Because bingo is a game of chance where the bingo operator is the only participant who always "wins", it might be said that the Chestnut property was to continue being used for the "processing of fish".

obsolete and, instead, required that leasehold improvements be subject to the MACRS-prescribed recovery periods. With respect to petitioner's claim that the expenditures to convert the facility to a bingo operation were lease acquisition costs, respondent contends that most of the expenditures were made subsequent to the time that the lease was in effect. Furthermore, petitioner has not shown, as he is required to, that the expenditures were for lease acquisition costs, as opposed to leasehold improvements, as reported by November and determined by respondent.

Accordingly, we hold that respondent's determination that petitioner is not entitled to a 10-year recovery period is sustained. Further, we hold that petitioner has failed to show that November is entitled to deduct any portion of the expenditure as a lease acquisition cost.

Is November Entitled To Deduct the $5,500 Portion of the
$12,293.36 Monthly Payment to the Lichtys' Entity?

Prior to and after the settlement of the lawsuit, November and the Lichtys' entity were obligated to pay $6,793.36 rent for use of the Chestnut property. The note executed from petitioner and/or November to the Lichtys also called for a $5,000 monthly payment for a period of years. After the settlement, November was required to pay to the Lichtys' entity $12,293.36, which amount was $5,500 more than the $6,793.36 rental payment. November claimed the $12,293.36 monthly payments as rent.

Respondent allowed the portion attributable to the rental of the Chestnut property but disallowed the $5,500 portion. Respondent argues that the $5,500 portion is a payment to the Lichtys in exchange for their interest in the operation. Under the circumstances here, the $5,500 portion of the monthly payment is not deductible rent, but it would be deductible under section 162 as an expense incurred in the operation of the bingo business. Respondent contends that the $5,500 monthly payments to the Lichtys are merely a continuation of the $5,000 monthly payments that were made on the note prior to the litigation and settlement. Again, respondent's argument rests on the premise that petitioner was acquiring capital assets under the settlement.

In these circumstances, we are not convinced that the $5,500 should be classified as capital in nature and nondeductible. As discussed in detail above, petitioner and/or November was the owner of the bingo operations on paper prior to the litigation and settlement but had an underlying agreement with the Lichtys to receive income for appearing as the owner and managing the business. The terms of the settlement do not delineate whether the $5,500 payment is in exchange for the Lichtys' capital interest or for the Lichtys' forbearance from interfering with petitioner's operation of the bingo business. The Lichtys were prohibited from having an interest in the bingo operation and

appeared, at least on paper, as not directly involved.  It is difficult to tell from the settlement the nature of the $5,500 portion of the monthly payments.  At the very least and in essence, petitioner had the right to earn income in connection with the bingo operation, and he was successful in protecting that right from the interference of the Lichtys and perhaps others.  The $5,500 monthly payments were not in exchange for an equity interest but instead were a cost of continuing the bingo business operation.  Accordingly, we hold that November is entitled to deduct the $5,500 portion of the payments made to the Lichtys through their corporate entity for the years under consideration.

Has Petitioner Shown That $10,350, $35,436, and $35,436 Were Incurred for Supplies for the 1991, 1992, and 1993 Tax Years, Respectively?

Respondent disallowed the above-listed amounts due to petitioner's failure to substantiate that the amounts were expended for deductible business supplies.  Petitioner did not offer any evidence at trial regarding these amounts.  Accordingly, respondent's determination on these items is sustained.

Does Petitioner Have Basis in His S Corporation so as To Be
Entitled To Deduct Any of the Passthrough Losses That May Be
Finally Redetermined for the Years Under Consideration?

We now turn to a critical[9] question of whether petitioner has sufficient basis in November so as to be able to deduct any passthrough losses. In accord with the Form K-1 petitioner received from November, he claimed a $753,728 passthrough loss. Respondent determined that petitioner was not entitled to the claimed loss on the grounds that petitioner had a passthrough gain in each year due to the disallowance of various deductions claimed by November. Some of the disallowed deductions are the subject of this opinion, and our holding with respect to them may result in a passthrough and/or carryover loss for the taxable years under consideration. Respondent did not determine, in the notice of deficiency, that petitioner lacked sufficient basis to receive the "benefit" of any loss.

Respondent has shown that November's balance sheets reflect $1,000 in equity, and the loans to shareholders on November's balance sheets reflected $96,007 as of December 31, 1990, $143,548 as of December 31, 1991, $332,029 as of December 31, 1992, $578,231 as of December 31, 1993, and $768,223 as of December 31, 1994. No loans from shareholders were reflected for

---

[9] If petitioner is without basis in his S corporation, his success with respect to November's deduction items would, to the extent that November's expenses exceed its income, be a Pyrrhic victory.

the years under consideration. So there was a decidedly large flow of capital to petitioner from November, rather than the opposite. Petitioner did, however, recognize $79,768 and $20,099 of passthrough income from November, as reflected in Forms 1120S for 1989 and 1990 tax years.

Petitioner does not rely on contributions made directly to November to counter respondent's argument. Petitioner contends that the $1.5 million note to Krieger, on which both petitioner and November were shown as obligors, made him personally liable and would therefore constitute basis in November. Respondent contends that petitioner is merely a guarantor and, under the circumstances of this case, should not be permitted S corporation basis attributable to the note. The note to Attorney Krieger cannot be fully understood without reference to the integral accompanying agreement between the parties. In that agreement it is made clear that but for the success in settlement of the lawsuit, petitioner and November would have been "bankrupt". Significantly, the note is only to be paid from income of November's bingo business. For example, it was agreed if the laws change to prohibit bingo, Krieger would "receive no payments" on the note. More particularly, the payment on the note to Krieger was dependent on November and the profitability of its bingo business, and Krieger did not look to petitioner, individually, for payment. Accordingly, in this setting,

petitioner was a guarantor who had not pledged any individual assets and who, but for November's business, was without means to pay the $1.5 million note to Krieger.

This Court and several U.S. Courts of Appeals have held that, absent an economic outlay by a taxpayer, guaranties of loans do not increase basis in S corporation stock. See Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989) (and cases cited therein). The Court of Appeals for the Eleventh Circuit held in particular circumstances that some guaranties may be sufficient to constitute basis where the facts show that, in substance, the shareholder has borrowed funds and subsequently advanced them to the corporation. See Selfe v. United States, 778 F.2d 769, 774 (11th Cir. 1985). The key factor emphasized by the Court of Appeals was that the "lender [looked] to [the] shareholder as the primary obligor." Id.

Any appeal of our decision here will lie in the Court of Appeals for the Eleventh Circuit, and, accordingly, we must decide whether Selfe v. United States would compel our holding for petitioner on this issue.[10] The Selfe v. United States holding would permit a stepped-up basis where the facts show

---

[10] Under our holding in Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we follow, if it is directly on point, a holding by the Court of Appeals to which our decision would be appealable.

that, in substance, the shareholder has borrowed funds from a third party and subsequently advanced them to the corporation. In particular, the Court of Appeals emphasized that it would be relevant whether the creditor looked to the shareholder as the primary obligor in the circumstances of <u>Selfe v. United States</u>, <u>supra</u>. The circumstances here are factually distinguishable from <u>Selfe</u>. See <u>Spencer v. Commissioner</u>, 110 T.C. 62, 83-87 (1998), affd. without published opinion 194 F.3d 1324 (11th Cir. 1999). Petitioner had no individual assets and did not put up any security. More significantly, November's bingo business income was the sole source available and one which had been specifically designated for payment of the debt to Krieger.

Accordingly, we do not feel compelled to follow <u>Selfe</u> in this instance and, instead, hold that petitioner is not entitled to increase his basis in his S corporation with respect to any part of the $1.5 million debt to Krieger.[11]

<u>Should Respondent's Determination of a Negligence Penalty Under Section 6662(a) Be Sustained for 1991, 1992, or 1993?</u>

Respondent, for each of the 3 taxable years, determined an accuracy-related penalty, based on negligence, under section 6662(a). That section imposes an addition to tax in the amount of 20 percent of any portion of the underpayment attributable to

---

[11] The Court leaves the parties to the task of computing petitioner's correct basis in their Rule 155 computation(s) in accord with our findings and holdings.

negligence.  To avoid this penalty, petitioner must show that his actions were reasonable and not careless, reckless, or made with intentional disregard of rules or regulations.  See Delaney v. Commissioner, 743 F.2d 670 (9th Cir. 1984), affg. T.C. Memo. 1982-666.

Respondent determined that petitioner was liable for the penalty on the entire underpayment in each of the 3 years under consideration.  Accordingly, we must consider each adjustment to decide whether the portion of the underpayment attributable to it is due to negligence.  We recognize that petitioner had no particular business or tax expertise and became involved in the bingo operation merely as a front for others.  He relied on advisers (accountants and lawyers) for establishing business entities and for the preparation of his and his S corporation's returns.  On the seminal return (the one in which the S corporation claimed the loss) the deductions were taken in accord with petitioner's advisers' judgment.  Petitioner was successful with respect to two significant items in this litigation--the legal fee and the $5,500 monthly payments.  He was unsuccessful on the amortization and substantiation issues.

With respect to the amortization issue, that involved a technical interpretation of regulations, and petitioner's tax return preparer and adviser counseled petitioner to amortize the property based on a 10-year life.  Considering petitioner's

background and reliance, we hold that his actions with respect to that item were reasonable and are not subject to the section 6662 penalty.

With respect to the substantiation items and any items conceded, petitioner has failed to show that his actions were reasonable and not careless, reckless, or made with intentional disregard of rules or regulations.  Even considering petitioner's background, his inability to substantiate claimed expenditures is not reasonable.  Under these circumstances, we hold that petitioner is liable, in each of the 3 taxable years, for the accuracy-related penalty under section 6662(a) on the portion of any underpayment attributable to the substantiation issues decided and on the adjustment items that he conceded.

To reflect the foregoing and due to concessions,

<u>Decision will be entered under</u>

<u>Rule 155.</u>